1   Paul H. Duvall (CA State Bar # 73699)
2   pduvall@kingballow.com
    KING & BALLOW
3   9404 Genesee Avenue; Suite 340
4   La Jolla, CA  92037-1355
    858/597-6000 Facsimile:  858/597-6008
5
6   Attorney for Defendant Integra Software Systems, LLC
7
8                    UNITED STATES DISTRICT COURT
9
10                 NORTHERN DISTRICT OF CALIFORNIA
11
12
13   **WHOLESALE AMERICA MORTGAGE,**          ) **Case No. C08-02720 MMC**
     **INC. dba California Financial Group,**  )
14                                             ) **DECLARATION OF PAUL**
                                               ) **H. DUVALL IN SUPPORT**
                                **Plaintiff,** ) **OF DEFENDANT'S**
15   v.                                        ) **MOTION TO DISMISS**
16   **INTEGRA SOFTWARE SYSTEMS, LLC,**        )
17   **and DOES 1-50, inclusive,**             ) **DATE: July 18, 2008**
                                               ) **TIME:  9:00 a.m.**
18                               **Defendant**  )
                                               ) **HONORABLE MAXINE M.**
19 ────────────────────────────────────────── ) **CHESNEY; COURTROOM**
                                               ) **7; 19TH FLOOR; 450**
20                                             ) **GOLDEN GATE AVENUE;**
                                               ) **SAN FRANCISCO, CA**
21                                             ) **94102**
                                               )
22
23         I, Paul H. Duvall, make the following statements upon personal knowledge:
24
25         1.     I am an attorney at the law firm of King & Ballow, counsel to Defendant
26   Integra Software Systems.  I am licensed to practice law in California.  I have personal
27   knowledge of the matters herein and could competently testify thereto under oath if
28

1    called as a witness. I submit this declaration in support of Defendant's motion to

2    dismiss.

3
4           2.      Attached hereto as Exhibit A is a true and correct copy of the complaint

5    and the exhibit in this matter.

6
7           3.      Attached hereto as Exhibit B is a true and correct copy of *Frigate Limited*

8    *v. Cecilia L. Damia,* 2007 U.S. Dist. LEXIS 5902.

9           4.      Attached hereto as Exhibit C is a true and correct copy of *Soil Shield*

10   *International, Inc. v. Lilly Industries, Inc.,* 1998 U.S. Dist. LEXIS 8002.

11
12          I declare under penalty of perjury under the laws of the State of California that

13   the foregoing is true and correct. Executed this 5th day of June, 2008, in La Jolla,

14   California.

15

16

17   DATED:  June 5, 2008                          /s/  Paul H. Duvall
                                                    Paul H. Duvall
18

19

20

21

22

23

24

25

26

27

28

# Exhibit   A

1   RICHARD T. BOWLES (# 46234)
    VERONICA O. BENIGNO (# 238053)
2   BOWLES & VERNA LLP
    2121 N. California Boulevard, Suite 875
3   Walnut Creek, California 94596
    Telephone: (925) 935-3300
4   Facsimile: (925) 935-0371
    Email: rbowles@bowlesverna.com
5
    Attorneys for Plaintiff
6   Wholesale America Mortgage dba California Financial Group

7

8                IN THE SUPERIOR COURT OF CALIFORNIA

9                IN AND FOR THE COUNTY OF ALAMEDA

10
    WHOLESALE AMERICA MORTGAGE, INC.            CASE NO.: RG08394967
11  dba CALIFORNIA FINANCIAL GROUP,
                                                COMPLAINT FOR BREACH OF
12              Plaintiff,                      WRITTEN CONTRACT, RESCISSION,
                                                INTENTIONAL MISREPRESENTATION,
13      vs.                                     AND NEGLIGENT
                                                MISREPRESENTATION
14  INTEGRA SOFTWARE SYSTEMS, LLC, and
    Does 1-50, inclusive,
15                                              DEMAND FOR JURY TRIAL
                Defendants.
16

17      Plaintiff WHOLESALE AMERICA MORTGAGE, INC. dba CALIFORNIA FINANCIAL

18  GROUP complains against Defendants, and each of them, as follows:

19                          **GENERAL ALLEGATIONS**

20      1.      Plaintiff WHOLESALE AMERICA MORTGAGE, INC. dba CALIFORNIA

21  FINANCIAL GROUP (hereinafter "CFG" or "Plaintiff") is, and at all times relevant hereto was, a

22  corporation duly organized and existing under the laws of the State of California with its principal place

23  of business in Pleasanton, Alameda County, California.

24      2.      Plaintiff is informed and believes and on that basis alleges that Defendant INTEGRA

25  SOFTWARE SYSTEMS, LLC (hereinafter "Integra" or "Defendant"), is a limited liability company

26  duly organized and existing under the laws of Tennessee that provides loan origination software to its

27  mortgage lending clients.

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

                                            1
                                        COMPLAINT

                                                            A-3

3.    The true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, are presently unknown to Plaintiff, and therefore Plaintiff sues such Defendants by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that DOES 1 through 50 were in some manner responsible for the damages alleged herein, and Plaintiff will seek leave of this Court to insert the true and correct names of any such DOE Defendant once their identities are ascertained.

4.    Plaintiff is informed and believes, and on that basis alleges, that Defendants, including those designated as DOES 1 through 50, inclusive, were and are the agents, employees, co-venturers, partners, or in some manner agents or principals, or both, for each other, and in doing the acts alleged herein were at all times acting within the course and scope of their agency, employment, venture or partnership.

5.    On or about May 17, 2007, CFG's President, Ronald D. Perkins, signed a Software Licensing Agreement (hereinafter "Agreement") with Defendant Integra. In the Agreement, Integra agreed to create and install a custom-tailored Loan Origination System ("LOS") to meet CFG's business needs. Integra represented that the LOS would include a pricing engine with live products, pricing and guidelines, integration with CFG's Amcat Dialer, broker and consumer portals, banking management and reporting, and accounting and payroll capabilities as well as reporting.

6.    Aside from paying for Integra's custom build, CFG was also purchasing from Integra a license to access and use the LOS. A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.

7.    Upon execution of the Agreement, and as required by its terms, CFG paid $85,500 to Integra.

8.    Even before CFG executed the Agreement, beginning in approximately March 2007 to June 2007, CFG was providing Integra and its Project Manager, Rob Sandoz, with requested information, including CFG's current banking and accounting reports, in order to assist Integra with the software build. Thus, at all times relevant herein, Integra was aware of CFG's business needs.

9.    During this time period, CFG was under the expectation that "training" of CFG employees on the LOS would be completed by the end of July 2007.

A- 4

10.     Sometime on or about June 14, 2007, CFG realized that "training and implementation" was, in reality, the technical build of the LOS software and that, contrary to Integra's representations, no training was included in the contract.

11.     During the week of June 25, 2007, another Integra employee, Nancy Shurson, came on-site to assist with the "implementation training." Up until this point, CFG was informed and believed that it had provided Integra with all the information necessary to start and complete the software build. However, Ms. Shurson seemed to be repeating the information gathering phase of the process already done by Mr. Sandoz. CFG later learned that Ms. Shurson's role was to perform the actual technical administrative build of the software.

12.     At all relevant times, CFG was informed and believed and on that basis alleges that the time and services provided by Mr. Sandoz and Ms. Shurson were not going to exceed the project budget, nor were they going to be excessive or out-of-the-norm charges.

13.     Beginning in June 25, 2007, Ms. Shurson began performing various "projects" she claimed were part of the build of the software without first consulting with anyone at CFG. Ms. Shurson was constantly reassuring CFG that the software build was "on or ahead of schedule." At no time did anyone from Integra, or Ms. Shurson, inform CFG that it was going over-budget with this project.

14.     Sometime between July 25, 2007 and August 8, 2007, CFG learned that it had exceeded the budget on the installation and implementation of Integra's system. Integra advised CFG that the next step of the build was to conduct an "Early User Acceptance Training" to provide feedback to Integra's programmer. However, because CFG had incurred unexpected costs, it did not hire Integra to conduct the training nor could it pay for the creation of such training materials. As a result, no operable system was ever installed.

15.     By the end of August 2007, CFG was forced to reassess the Integra project based on Integra's failure to deliver usable software within a reasonable budget and time frame.

///

///

///

A-5

**FIRST CAUSE OF ACTION**
(Breach of Written Contract Against All Defendants)

16.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 15, as though set forth in full herein.

17.    On or about May 17, 2007, CFG entered into a written Agreement with Integra for a custom-built LOS, a true and correct copy of which is attached hereto as **Exhibit 1**. The LOS was supposed to include a pricing engine with live products, pricing and guidelines, integration with CFG's Amcat Dialer, broker and consumer portals, banking management and reporting, and accounting and payroll capabilities as well as reporting.

18.    CFG has performed all conditions, covenants, terms, and obligations Integra required to be performed on CFG's part under the Agreement, including purchasing hardware from a third-party that was compatible with the software system Integra was going to install; providing Integra with access to its computer hardware and system software; and utilizing Integra's Project Management, Training, and Implementation services to assist with the build and implementation of the LOS. Any performance which CFG has not rendered has been excused, waived, is not yet due or is unenforceable as a matter of law.

19.    To date, CFG has paid Integra $140,500 pursuant to the Agreement. CFG has also incurred additional expenses because Integra required CFG to purchase third-party hardware that was compatible with Integra's software.

20.    CFG adhered to all instructions and specifications for installation provided by Integra and its personnel.

21.    Integra has breached the Agreement by, among other things, failing to complete the software build within the project timeline and in accord with its reassurances that the software build was "on or ahead of schedule." Integra also breached the Agreement by failing to deliver and install, at any time, an operable, usable LOS which was to include a pricing engine with live products, pricing and guidelines, integration with CFG's Amcat Dialer, broker and consumer portals, banking management and reporting, and accounting and payroll capabilities as well as reporting.

A-6

22.    Integra also failed to inform CFG that certain services, especially the "projects" performed by Ms. Shurson without CFG's consent, would be and actually was putting CFG over budget on this project and therefore resulted in the accruement of additional expenses that were not disclosed.

23.    As a direct and proximate result of Integra's breaches of the Agreement, CFG has been damaged in an amount according to proof at trial, but in no event less than the jurisdictional minimum of this Court.

WHEREFORE, Plaintiff prays for judgment as more fully set forth below.

## SECOND CAUSE OF ACTION
### (Rescission of Contract Against All Defendants)

24.    Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 23, as though set forth in full herein.

25.    On or about May 17, 2007, CFG entered into a written Agreement with Integra for a custom-built Loan Origination System ("LOS") which was to include a pricing engine with live products, pricing and guidelines, integration with CFG's Amcat Dialer, broker and consumer portals, banking management and reporting, and accounting and payroll capabilities as well as reporting. A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.

26.    CFG has performed all conditions, covenants, terms, and obligations required to be performed under the Agreement, including paying $85,500 as consideration for Integra's services; purchasing hardware from a third-party that was compatible with the software system Integra was going to install; providing Integra with access to its computer hardware and system software; and utilizing Integra's Project Management, Training, and Implementation services to assist with the build and implementation of the LOS. Any performance which CFG has not rendered has been excused, waived, is not yet due or is unenforceable as a matter of law.

27.    To date, CFG has paid Integra $140,500 pursuant to the Agreement. CFG has also incurred additional expenses because Integra required CFG to purchase third-party hardware that was compatible with Integra's software.

28.    CFG's consent was obtained through fraudulent and/or negligent misrepresentations of material fact. Through Integra's representations, CFG was informed and believed that installation and

Bowles & Verna LLP
2121 N. California Blvd
Suite 875

A-7

1   implementation of the software was "on or ahead of schedule," and that the actual "training" of CFG's

2   end users would be completed by the end of July 2007.

3        29.    Also, at all relevant times, CFG was informed and believed and on that basis alleges that

4   the time and services provided by Mr. Sandoz and Ms. Shurson were not going to exceed the project

5   budget, nor were they going to be excessive or out-of-the-norm charges. At no time did Integra,

6   including Ms. Shurson, inform CFG that it was going over-budget with this project.

7        30.    Integra failed to fulfill its representations and provide CFG with an operable software

8   system within the project timeline and budget.

9        31.    By August 2007, no usable software had been built and/or implemented onto CFG's

10  computer system. CFG was advised by Integra that the next step of the build was to conduct an "Early

11  User Acceptance Training" (UAT) to provide feedback to Integra's programmer. Based on the

12  excessive budget, CFG agreed to attempt to conduct the "UAT" without Integra in order to keep costs

13  down. With no budget, no training and no useable software, CFG was rendered helpless. As a result,

14  no operable system was ever installed.

15       32.    By the end of August 2007, CFG ceased using Integra's services.

16       33.    Between November 2007 to December 2007, Integra and CFG entered discussions to

17  renegotiate the balance due to Integra and the deliverables due to CFG. CFG considered paying

18  additional money to Integra, however, after reviewing the package, the final product would still lack

19  banking management and reporting and accounting and payroll management and reporting. As a result,

20  CFG decided to not move forward.

21       34.    On or around April 14, 2008, CFG offered to return any of Integra's software and/or

22  hardware installed in exchange for all of CFG's payments made pursuant to the Agreement.

23       35.    Had Integra informed CFG of the true facts, including the actual amount of time it would

24  take to build the software and that the software build would be from scratch, CFG would not have agreed

25  to purchase Integra software system and/or use its services.

26       36.    CFG is therefore entitled to rescind the Agreement due to Integra's intentional and/or

27  negligent misrepresentations, and as such is entitled to the return of its consideration and other

28  payments – $140,500 – plus interest, and other damages according to proof.

A - 8

1    WHEREFORE, Plaintiff prays for judgment as more fully set forth below.

2
## THIRD CAUSE OF ACTION
3    (Intentional Misrepresentation Against All Defendants)

4    37.    Plaintiff hereby incorporates by reference each and every allegation contained in

5    paragraphs 1 through 36, as though set forth in full herein.

6    38.    May 17, 2007, CFG entered into a written contract with Integra for a custom-build LOS

7    that would a pricing engine with live products, pricing and guidelines, integration with CFG's Amcat

8    Dialer, broker and consumer portals, banking management and reporting, and accounting and payroll

9    capabilities as well as reporting.

10    39.    Throughout their business dealings, Integra made representations to CFG that were false,

11    including that the software build, installation, and implementation would work for CFG and fit CFG's

12    business needs; that the software installation and implementation was "on or ahead of schedule"; that

13    Integra would assist with end user training which would be completed by July 2007; that Integra would

14    install and implement an operable software system in a timely manner and within the agreed upon

15    budget.

16    40.    Integra knew these representations were false when made or made such representations

17    recklessly without regard for their truth.  Integra further made these representations with the intent to

18    induce CFG to take the actions herein alleged.

19    41.    CFG has performed all conditions, covenants, terms, and obligations required to be

20    performed on its part under the Agreement in reasonable reliance on Integra's representations.  CFG

21    purchased hardware from a third-party that was compatible with Integra's software system; it provided

22    Integra with access to its computer hardware and system software; and utilized Integra's Project

23    Management, Training, and Implementation services to assist with the build and implementation of the

24    LOS.

25    42.    As a direct and proximate result of Integra's representations, CFG has been harmed and

26    damaged.  CFG's reliance on Integra's representations was a substantial factor in causing CFG's harm.

27    43.    CFG has been damaged in an amount according to proof at trial, but in no event less than

28    the jurisdictional minimum of this Court.

A-9

44.     Integra has acted with oppression, fraud, and malice within the meaning of Civil Code Section 3294 by intentionally misrepresenting material facts as alleged herein. CFG is entitled to recover from Defendants, and each of them, punitive damages in an amount according to proof at trial.

WHEREFORE, Plaintiff prays for judgment as more fully set forth below.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation Against All Defendants)

45.     Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 44, as though set forth in full herein.

46.     CFG entered into a written contract with Integra for a custom-build LOS that would include a pricing engine with live products, pricing and guidelines, integration with CFG's Amcat Dialer, broker and consumer portals, banking management and reporting, and accounting and payroll capabilities as well as reporting.

47.     Integra made representations to CFG that were not true, including that the software build, installation, and implementation was "on or ahead of schedule"; that Integra would assist with end user training that would be completed by July 2007; and that Integra would install and implement an operable software system in a timely manner and within the agreed upon budget.

48.     Integra had no reasonable grounds for believing these representations were true when made, and made these representations with the intent to induce CFG to take the actions herein alleged.

49.     CFG has performed all conditions, covenants, terms, and obligations required to be performed on its part under the Agreement in reasonable reliance on Integra's representations.

50.     As a direct and proximate result of Integra's representations, CFG has been harmed and damaged, and CFG's reliance on Integra's representations was a substantial factor in causing such harm.

51.     CFG has been damaged in an amount according to proof at trial, but in no event less than the jurisdictional minimum of this Court.

///

///

///

Bowles & Verna LLP
2121 N. California Blvd
Suite 875

A-10

1

## PRAYER

2    WHEREFORE Plaintiff California Financial Group prays for judgment against Defendants

3  Integra Software Systems, LLC and Does 1 through 50, and each of them, as follows:

4      1.     For rescission of the Software Licensing Agreement and restitution of the contract price;

5      2.     For compensatory damages in an amount to be proven at trial and in no event less than

6  the jurisdictional minimum of this Court;

7      3.     For punitive damages under Civil Code Section 3294 as determined by the jury;

8      4.     For reasonable attorneys' fees as allowed by law;

9      5.     For all interest allowed by law;

10     6.     For CFG's costs of suit herein; and

11     7.     For such other and further relief as the Court may deem proper.

12

13  Dated: May 1, 2008                           BOWLES & VERNA LLP

14

15                                      By:

16                                           Richard T. Bowles
                                             Veronica Ann O. Benigno
17                                           Attorneys for Plaintiff
                                             Wholesale America Mortgage dba
18                                           California Financial Group

19

20

21

22

23

24

25

26

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

9

COMPLAINT

A-11

# Software Licensing Agreement

## 1.    INTRODUCTION

This is an Agreement between Integra Software Systems, LLC of 117 Seaboard Lane, Suite F-290, Franklin, TN 37067 ("Licensor") and California Financial Group of 2600 Stoneridge Mall Road, Suite 200, Pleasanton, CA 94588 ("Licensee") under which Licensor is licensing software on a non-exclusive basis for the Licensee's own use under the terms and conditions stated below.

## 2.    DEFINITIONS.

As used in this Agreement, the following definitions shall apply:

2.1.    "Agreement" shall mean this Agreement between Licensor and Licensee.

2.2.    "Authorized User" shall mean any officer, employee, or other party as designated by Licensor to act as an Individual LOS User, Concurrent LOS User, Non-Production User or System Manager of the Program.

2.3.    "Confidential Information" shall include all information relating to Licensor's and Licensee's businesses, products and services, including but not limited to data, trade secrets, discoveries, ideas, concepts, know-how, techniques, software (including the Program), business activities and operations, reports, studies and other technical and business information of Licensor and Licensee, and any other information clearly designated in writing as confidential by either party.    Without limitation of the foregoing, the parties agree that Confidential Information of Licensee includes, but is not limited to, all data and information regarding the customers and potential customers of Licensee, the identity of Licensee's customers and potential customers and all "nonpublic personal information" pertaining to Licensee's "customers" and "consumers" as such quoted or similar terms are defined in the Privacy Laws, (together, "Customer Data").

Confidential Information shall not include information that is: (i) at the time of disclosure to the receiving party hereunder, in the public domain; (ii) after disclosure to the receiving party hereunder, published or otherwise becomes part of the public domain through no fault of the receiving party; (iii) without a breach of duty owed to the disclosing party hereunder, is in the possession of the receiving party hereunder at the time of disclosure to the receiving party; (iv) received after disclosure to the receiving party hereunder from a third party who had a lawful right to and, without a breach of duty owed to the disclosing party, did disclose such information to the receiving party; or (v) independently developed by the receiving party hereunder without reference to or use of information which would otherwise constitute Confidential Information of the disclosing party hereunder.

2.4.    "Concurrent User" shall mean a user who is granted access to the Program, or any other application as defined in Section 9.2 of this Agreement, provided that the total number of simultaneous accesses granted under this Agreement has not been exceeded.

2.5.    "Effective Date" shall mean the date upon which both Licensee and a duly authorized officer of Licensor has approved and signed the Agreement.



EXHIBIT "1"

A-12

2.6.    "Individual User" shall mean a user who is granted access to the Program, or any other application as defined by Section 9.2 of this Agreement, provided that the total number of accesses granted by individual authorizations on specified computers have not been exceeded.

2.7.    "Installation Date" shall mean the first day of initial installation and configuration of the software on Licensee's computer hardware.

2.8.    "License Fee" shall mean the fee for licensing the Program or Programs as specified in the attached Schedule B to the Agreement.

2.9.    "Non-Production User" shall mean a user who is granted access to the Loan Origination System (LOS) functionality for the express purpose of testing or evaluating new releases or custom programming changes.

2.10.    "Privacy Laws" means the federal law commonly referred to as the Gramm-Leach-Bliley Act (15 U.S.C. 601 et seq.), the implementing regulations issued in connection therewith, (12 CFR Part 40), as both are in effect from time to time, and all other federal and state laws and regulations pertaining to the confidentiality, use and/or disclosure of information by financial institutions, and all court, agency and administrative decisions, policies and proceedings related thereto, as may from time to time be in effect.

2.11.    "Program" shall mean all computer software, machine executable code, Scheme, Java or other language source code, configuration files, and associated documentation which is created by or supplied, either directly or indirectly, by Licensor including all Releases which are provided from time to time.

2.12.    The term "Release" shall mean a subset of a Version of the Program or any materials which are supplied by Licensor at or after the delivery of the Program, including any software provided for the purpose of improving the functions or performance of the Program, changing the intellectual property contained in the Program, expanding the capability or ease of operation of the Program, or for the purpose of fixing errors in program logic, or meeting regulatory requirements.

2.13.    The term "Software Support" shall mean support and maintenance services provided by Licensor as defined in Schedule A for Programs provided for in this Agreement.

2.14.    The term "Software Support Fee" shall mean that applicable Quarterly fee due for Software Support in accordance with Licensor's Software Support Schedule.

2.15.    The term "Version" shall mean a major application change to the Program which significantly alters the database structure, design or look and feel of the Program.

## 3.    GRANT OF LICENSE

3.1.    Licensor hereby grants to Licensee, and Licensee hereby accepts, a perpetual non-exclusive license to use the Program subject to the terms and provisions of this Agreement.

3.2.    The license granted by this Agreement authorizes use of the Program as specified in Schedule B.

3.3.    Licensee recognizes that Licensor will control the licenses granted by incorporating either software, hardware or a combination of both to work in conjunction with the Program to assist in the Licensor's protection against unauthorized use.

A-13

3.4.    The license granted by this Agreement authorizes use of the Program only on the computer hardware or similar hardware to that listed in the attached Schedule C to the Agreement ("Authorized Hardware").

3.5.    For Individual LOS User licenses only, one copy of the Program must be licensed for each computer or workstation on which the Program is installed.

3.6.    The Program may be installed on more than a single network and access may be permitted providing the Licensee complies with the terms stated in Schedule B.

## 4.    SCOPE OF THE AGREEMENT

This Agreement shall apply to each Program or Release of each Program that Licensee is currently licensing from Licensor or shall license in the future.

## 5.    COPIES OF THE PROGRAM

5.1.    Licensor shall furnish to Licensee one copy of the Program.

5.2.    Licensee shall be entitled to make additional copies of the Program to the extent necessary for use of the Program by authorized users on the Licensee's computer hardware. Licensee shall reproduce and include copyright or trade secret notices on any copies in the same text as stated in the copies provided to Licensee.

5.3.    Licensee is authorized to make additional copies of the Program to run on separate development and test environments for non-production use, as well as for disaster recovery

## 6.    INSTALLATION

6.1.    Initial installation of the Program on a computer shall be Licensor's responsibility. Subsequent installations of the software shall be Licensee's responsibility. Licensee shall follow the installation procedures as prescribed by Licensor.

6.2.    At such time that Licensor performs the initial installation of the Program, the following provisions shall apply: Licensor shall load the Program on Licensee's computer hardware and conduct Licensor's standard test procedures on the installed Program. Licensor shall be relieved of its obligation to perform the installation, until Licensee's computer hardware and operating system software are in good operating condition. Licensee shall provide Licensor with access to the computer hardware and electrical power, workspace and such other items as may be required to complete the installation.

## 7.    PAYMENT OF PROGRAM LICENSE FEE

In consideration of the license granted under this Agreement, Licensee shall pay to Licensor the License Fee as defined in Schedule B.

A-14

8. **ACKNOWLEDGMENT OF LICENSOR'S OWNERSHIP RIGHTS**

All rights in the Program including but not limited to Confidential Information, trade secrets, trademarks, service marks, patents, and copyrights are, shall be and will remain the property of Licensor or any third party from whom Licensor has licensed software or technology. All copies of the Program delivered to Licensee or made by Licensee remain the property of Licensor.

9. **RESTRICTIONS**

9.1.    Each party shall keep in confidence all Confidential Information of the other party and will not directly or indirectly disclose to any third party or use for its own benefit, or use for any purpose other than the performance of its obligations or exercise of its rights under this Agreement, any Confidential Information it receives from the other party. Each party shall use the same degree of care to protect the other party's Confidential Information as it would employ with respect to its own information of like importance which it does not desire to have published or disseminated, and in no event less than a reasonable degree of care. Licensee agrees to keep the Program in confidence and to take all reasonable precautions to ensure that no unauthorized persons, including but not limited to competitors of Licensor or other software development companies have access to the Program and that no unauthorized copies are made. Each party may make Confidential Information of the other party available to those of its employees, agents, contractors or service providers who have a need to know such information and who are subject to binding use and disclosure restrictions at least as protective as those set forth herein. Licensor shall provide the appropriate training to its employees and to its subcontractors, if any, to ensure compliance with this Agreement in all respects by Licensor, its employees, and its subcontractors, if any. Notwithstanding the foregoing, either party may make disclosures as lawfully required or requested by a court of law, or any governmental entity or agency in connection with seeking any governmental or regulatory approval or in connection with a judicial proceeding, provided that the party source of the Confidential Information is given prior notice sufficiently in advance of such disclosure to contest the disclosure, reasonable measures are taken to limit such disclosure and to obtain confidential treatment or a protective order and the party source of the Confidential Information is allowed to participate in such efforts. Either party may seek injunctive relief to enforce its rights under this Subsection.

9.2.    Licensee agrees that the database layout ("Schema") supplied with, and an integral part of, the Program is copyrighted by Licensor and specifically requires a license for each use, whether that use is by the Program, or any other application written or owned by Licensee or any other third party, which is intended for the specific purpose to add, change or delete data represented by the aforementioned Schema, whether in whole or any part thereof.

9.3.    Licensee may not alter any proprietary markings on the Program, including copyright, trademark, trade secret, and patent legends.

9.4.    Licensee may not de-compile, disassemble, or reverse engineer the Program.

A-15

9.5.    Licensee agrees to obtain prior written approval, which approval will not be unreasonably withheld, from Licensor before utilizing the services of any consultant or contractor to perform customizations or alterations to the program. Any customizations or alterations performed by anyone other than Licensor may invalidate any Warranty provided by Licensor and may also adversely affect the ongoing compliance and usability of the Program. Any modifications required by Licensor to correct any errors caused by the above customizations or alterations will result in charges based upon Licensor's then current rate for custom programming.

## 10.    LICENSEE'S OBLIGATION FOR DATA PROTECTION

10.1.    Licensee is required to perform daily backups of the data on the computer system used by the Program so that the likelihood of data loss is minimized. Licensee shall be solely responsible for backup software and hardware. Licensee shall provide the safe storage of all backup tapes and/or disks.

10.2.    Licensee shall be responsible for keeping its computer system free of computer viruses or any other hardware failures. Any loss of data resulting from computer viruses or any other hardware failures are the sole responsibility of the Licensee and are not covered under the Software Support agreement.

## 11.    WARRANTY

11.1.    Licensor owns all rights in and to the Program and Deliverables or has sufficient rights to grant the rights and licenses granted hereunder and has the full right, power and authority to grant such rights and licenses without the consent of any third party.

11.2.    Licensor warrants that the Program will perform materially in conformance with the user documentation supplied as part of the Program for any period in which Software Support is paid for and in effect under the terms of this Agreement ("Warranty Period").

11.3.    Neither the Program nor any Deliverable shall infringe any copyright, patent or trademark, misappropriate any trade secret, or otherwise infringe any intellectual property right of any third party. If all or any portion of the Program or any Deliverable becomes (or in the opinion of Licensee or Licensor may become) the subject of any claim or suit for infringement or violation (and in the event of any adjudication that the Program, Deliverable, or any portion thereof does infringe or if the use of the Program, Deliverable, or any portion thereof is enjoined), Licensor, at Licensor's sole expense and in addition to all other remedies available at law or under this Agreement, shall either:  (a) procure for Licensee the right to use the Program, Deliverable, or the affected portion thereof;  (b) replace the Program, Deliverable, or affected portion with other suitable software which is substantially similar to the Program, Deliverable, or affected portion in functionality and performance; or (c) modify the Program, Deliverable, or affected portion to make it non-infringing provided that the modified Program, Deliverable, or affected portion provides substantially the same functionality and performance as it did before such modification

11.4.    LICENSOR AND ANY THIRD PARTY FROM WHOM LICENSOR HAS LICENSED SOFTWARE OR TECHNOLOGY DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, WITH RESPECT TO THE PROGRAM AND THE ACCOMPANYING WRITTEN MATERIALS.

A-16

11.5.    LICENSOR AND ANY THIRD PARTY FROM WHOM LICENSOR HAS LICENSED SOFTWARE OR TECHNOLOGY WILL NOT BE LIABLE FOR LOST PROFITS, LOST OPPORTUNITIES, OR INCIDENTAL OR CONSEQUENTIAL DAMAGES UNDER ANY CIRCUMSTANCES.

11.6.    EXCLUSIVE REMEDY: LICENSEE'S EXCLUSIVE REMEDY AGAINST LICENSOR FOR ANY BREACH OF THIS AGREEMENT SHALL BE CORRECTION OF ANY ERROR OR DEFECT IN THE PROGRAM AS TO WHICH LICENSEE HAS GIVEN NOTICE.

11.7.    If any problem, operational failure or error of the Program has resulted from any alteration of the Program, accident, abuse, or misapplication, then this warranty shall be null and void, at Licensor's option.

## 12.    TRAINING

Upon delivery and installation, Licensor will provide Licensee with Training Services as specified on Schedule B upon the payment terms stated therein. Thereafter training services will be provided on the terms and at prices stated in Licensor's then current schedule of fees for training services.

## 13.    SOFTWARE SUPPORT

13.1.    Software Support for the Program shall consist of the services set forth on Schedule A hereto. Software Support shall be provided to mutually agreed upon "Authorized Users" of the Program.

13.2.    During the Warranty Period specified above, Licensee shall be entitled to software support. "Expiration Date" shall mean the date of the expiration of the Warranty Period and each subsequent anniversary of such date. Before each Expiration Date, Licensee shall be billed for the then applicable Quarterly Software Support Fee. If Licensee has paid the applicable Software Support Fee on or before the Expiration Date, Licensee shall be entitled to receive an additional three months of Software Support. Licensor shall have no obligation to provide Software Support 30 days after the Expiration Date if the applicable Quarterly Software Support Fee is unpaid.

13.3.    The Software Support Fee shall be sent to Licensor at the address set forth above, or such other address as Licensor may designate. Information as to the amount of the currently applicable Software Support Fee for the Program is available from the Licensor on request.

13.4.    Licensor's current policy is to support the most current Release of the software and the next prior Release; provided however that Software Support shall be provided on each Release for a minimum period of six (6) months.

13.5.    Licensee acknowledges and agrees that it may be necessary to update its computer hardware and/or operating system to achieve compatibility with the currently supported version. Licensee acknowledges and agrees that if it has allowed its subscription to Software Support to lapse, and if its version of the Program is not currently supported, it may have to obtain a current version to obtain Software Support, as is discussed below.

13.6.    If Licensee is not using a currently supported version of the Program, Licensor may suspend provision of Software Support for the Program until Licensee cures this condition without refunding the Software Support Fee.

A-17

13.7.    Licensee may terminate Software Support by written notice to Licensor prior to any Software Support Fee anniversary as defined in Schedule B, 2b. However, Licensor shall not be required to refund any Software Support Fee.

13.8.    If Software Support has been terminated or has lapsed, Licensee may reinstate its subscription to Software Support upon payment of the annual Software Support Fee in effect at the time, plus a reinstatement fee equal to 50% of the annual Software Support Fee in effect at the time. Upon reinstatement of Software Support, Licensee will be upgraded to the current version of the Program.

13.9.    Any installation required for an upgrade to a currently supported version of a Program under any paragraph of this Agreement, when performed by Licensor, will be charged to Licensee at Licensor's then current hourly rates plus reimbursement for any out-of-pocket costs or expenses incurred by Licensor. Such installation charges shall be in addition to other fees or charges that may be due.

## 14.    TERM AND TERMINATION

14.1.    The term of this Agreement shall commence upon the Effective Date and shall continue in effect until terminated as provided for herein. This document shall not become effective unless a duly authorized officer of Licensor has approved and signed the Agreement.

14.2.    It is agreed that either party may terminate this Agreement immediately upon written notice to the other party in the event that such other party (a) becomes insolvent or makes an assignment for the benefit of creditors; (b) files or has filed against it any petition under any Title of the United States Code or under any applicable bankruptcy, insolvency, reorganization or similar debtor relief law which is not discharged within thirty (30) days of said filing, or (c) requests or suffers the appointment of a trustee or receiver, or the entry of an attachment or execution as to a substantial part of its business or assets.

14.3.    Licensor may terminate this Agreement in the event Licensee (a) fails to make, when due, any License Fee payment or other payments required under this Agreement; (b) commits a material breach of any of its obligations concerning scope of use or the protection of the Program, intellectual property of Licensor, and Confidential Information; or (c) materially breaches any of its other obligations under any provision of this Agreement, which breach is not remedied within thirty (30) days after notice thereof by Licensor to Licensee.

## 15.    RIGHTS UPON TERMINATION

15.1.    Upon termination of this Agreement, Licensee's license to use the Program shall terminate, and Licensee shall immediately turn over to Licensor all copies of the Program, and any other Confidential Information relating to the Program and shall remove and erase completely any copies of the Program installed or recorded on any hard disk or other storage medium. Licensee shall promptly certify to Licensor in writing that it has complied with this requirement.

15.2.    Upon termination of this Agreement, Licensee shall pay to Licensor all fees due through the effective date of such termination. Unless otherwise specified herein or otherwise agreed in writing, all fees collected or accrued prior to the date of termination shall be retained by Licensor without any pro rata refund to Licensee.

15.3.    The termination of this Agreement shall not extinguish any rights or obligations of the parties relating to protection of Confidential Information.

A-18

16.    **AUDIT**

During the term of this Agreement and for a term of one year after termination, upon reasonable notice, Licensor may enter the premises of Licensee and perform reasonable audit and inspection procedures to confirm that Licensee is in compliance with the terms and conditions of the Agreement, including, but not limited to, provisions relating to scope of use of the Program, protection of Confidential Information, and termination. Licensee shall cooperate in any such inquiry.

17.    **ESCROW AGREEMENT**

Upon execution of this agreement, Licensor will enroll Licensee as a beneficiary under the technology escrow account established between Licensor and Iron Mountain Intellectual Property Management, Inc.. Licensee agrees to pay any enrollment charges and annual maintenance fees as required for all beneficiaries. Current annual maintenance fees are $500 per beneficiary, but are subject to change.

18.    **ASSIGNMENT**

18.1.    Licensee may not assign, in whole or in part, its rights granted in the Agreement without the express prior written consent of the Licensor, whereby that consent may be granted or withhold at the Licensor's sole discretion. Any purported assignment, except as provided for in this paragraph, shall be null and void and a material breach of this Agreement.

18.2.    The Licensee's assignment of this Agreement shall not discharge Licensee from its obligations, but shall make Licensee's assignee an additional obligor under this Agreement. Any assignment by Licensee will be invalid unless the assignee agrees in writing delivered to Licensor to be bound by and perform all obligations and terms of this Agreement.

19.    **GENERAL PROVISIONS**

19.1.    **Applicable Law.** This Agreement shall be construed pursuant to substantive law of the State of Tennessee.

19.2.    **Risk of Loss.** Upon delivery and installation of the Program, Licensee shall assume all risk of loss and damage to the Program, and shall at its sole cost and expense replace any lost or damaged portion thereof.

19.3.    **Taxes.** Licensee shall pay, in addition to the other amounts payable under this Agreement, all local, state and federal excise, sales, use, personal property, gross receipts and similar taxes (excluding taxes imposed on or measured by Licensor's net income) levied or imposed by reason of the transactions under this Agreement. Licensee shall, upon demand, pay to Licensor an amount equal to any such tax(es) actually paid or required to be collected or paid by Licensor.

19.4.    **Required Consents.** Licensee warrants that it has obtained lawful permission to use all hardware and software required in order for the Program to be used on Licensee's computer system.

A-19

19.5.    **Hardware and Third Party Software.** It is agreed that Licensee bears sole responsibility with respect to the adequacy, purchase, installation, configuration, performance, and maintenance associated with all hardware, operating systems, databases, and other third party software used in conjunction with the Program. Hardware or software recommendations made by Licensor are based on Licensor's experience, but due to variations in configuration and usage, Licensor cannot guarantee specific performances. Licensor is not responsible for installing, maintaining, or debugging third party hardware or software such as operating systems, servers, databases, or networks. Any request for assistance will be billable as custom work at Licensor's then current rate for custom programming. Any such work performed by Licensor is provided on a best efforts basis without warranty.

19.6.    **Public Reference.** Licensee consents to the public use of its name as a Licensee of Licensor as part of or pertaining to a customer list. Any use of Licensee name for advertising in any medium is restricted without prior Licensee approval.

19.7.    **Software Lock.** Licensee consents to acts by Licensor to disable the Program (including the triggering of software features that prevent operation of the Program) in the event that Licensee fails to pay the License Fee for the Program or uses or transfers the Program in breach of this Agreement. No such acts to disable the Program will be performed without written notice to Licensee from the Licensor.

19.8.    **Employee Solicitation.** Both parties mutually agree that during the term of this Agreement, for whatever reason, neither party will, directly or indirectly, solicit, seek or procure the services, whether as an employee or otherwise, of any employee or contracted individual of the other party who is or was employed by or contracted with the other party without the prior written consent of the other party, which may be withheld in the other party's sole discretion and upon such terms specified and agreed to in writing by the other party.

19.9.    **Required Acceptance by Officer of Licensor.** This Agreement is not binding upon Licensor until executed by an authorized representative of Licensor.

19.10.    **Modification.** This Agreement may not be modified or amended except in writing, which is signed by authorized representatives of each of the parties. No purported modification or amendment shall be binding until approved in writing and signed by an authorized representative of Licensor. This Agreement cannot be modified by e-mail correspondence.

19.11.    **No Waiver.** The failure of either party to exercise any right or the waiver by either party of any breach, shall not prevent a subsequent exercise of such right or be deemed a waiver of any subsequent breach of the same of any other term of the Agreement.

19.12.    **Notice.** Any notice required or permitted to be sent hereunder shall be in writing and shall be sent in a manner requiring a signed receipt, such as Federal Express, courier delivery, or if mailed, registered or certified mail, return receipt requested. Notice is effective upon receipt.

A-20

19.13.    **Force Majeure.** Neither party shall be deemed in default of this Agreement to the extent that performance of their obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies or any other cause beyond the control of such party ("Force Majeure") provided that such party gives the other party written notice thereof promptly and, in any event, within fifteen (15) days of discovery thereof and uses its best efforts to cure the delay. In the event of such Force Majeure, the time for performance or cure shall be extended for a period equal to the duration of the Force Majeure but not in excess of three (3) months.

19.14.    **Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter hereof and supersedes any prior oral or written promises or agreements. There are no promises, covenants or undertakings other than those expressly set forth in this Agreement.

19.15.    **Adequate Evaluation.** Licensee hereby acknowledges that it has been given ample opportunity, time, material, and access to the Program and Licensor's clients to adequately evaluate the Program.

19.16.    **Equitable Remedies.** The parties recognize that money damages is not an adequate remedy for any breach or threatened breach of any obligation hereunder by Licensee involving intellectual property, Confidential Information or use of the Program beyond the scope of the license granted by this Agreement. The parties therefore agree that in addition to any other remedies available hereunder, by law or otherwise, Licensor and any third party from whom Licensor has licensed software or technology shall be entitled to an injunction against any such continued breach by Licensee of such obligations.

19.17.    **Arbitration.** Any dispute relating to the terms, interpretation or performance of this Agreement (other than claims for preliminary injunctive relief or other pre-judgment remedies) shall be resolved at the request of either party through binding arbitration. Arbitration shall be conducted in Nashville, Tennessee under the rules and procedures of the American Arbitration Association ("AAA"). The parties shall request that the AAA appoint a panel of three arbitrators and, if feasible, include one arbitrator of the three who shall possess knowledge of computer software and its distribution; however the arbitration shall proceed even if such a person is unavailable.

19.18.    **Late Fees, Costs and Attorneys Fees.** A late payment charge of 1.5% per month, compounded monthly, shall apply to any payment due from Licensee that is in arrears for a period exceeding thirty (30) days. In any legal action or arbitration proceeding brought on any account, each party shall be responsible for their own costs of litigation or arbitration, including attorney's fees.

19.19.    **Exclusive Jurisdiction and Venue.** Any cause or action arising out of or related to this Agreement, including an action to confirm or challenge an arbitration award, may only be brought in the courts of applicable jurisdiction in Davidson County, TN at King & Ballow in Nashville, and the parties hereby submit to the jurisdiction and venue of such courts.

A-21

So agreed between the parties signing below.

Licensor: Integra Software Systems, LLC

By: _____

Name: GERALD D. PRATT

Title: PRESIDENT

Date: 5/21/07

Licensee: California Financial Group

By: _____

Name: Ronald D. Perkins

Title: President

Date: 5/15/07

A-22

# Schedule A - Software Support

## 1. SERVICES PROVIDED.

Software Support shall consist of the following services:

a) Licensor shall assist Licensee in diagnosing errors and malfunctions, which occur when the Program is used by Licensee. Licensor is not responsible for errors or malfunctions caused by any hardware or any third party operating system.

b) Licensor shall provide support services to Licensee to attempt to correct diagnosed errors and malfunctions. Licensor shall attempt to provide Releases that implement corrections and shall attempt to assist Licensee in using the Program in a way that can avoid diagnosed errors, malfunctions and defects.

c) Licensor shall provide support services to Licensee to attempt to keep the Program compatible with the then current version of the operating system of the computer hardware.

d) Licensor may provide Licensee with new Releases for the Program licensed to Licensee. Releases may include new features and functions added to the Program and/or may provide corrections to errors or malfunctions. The timing and content of Releases will be at the sole discretion of Licensor.

e) Licensor will affect delivery of each Release to Licensee. All deliveries and shipments of Releases will be at Licensor's expense. The Licensee will install each Release at Licensee's expense.

f) Licensor will perform remote diagnostics when Licensor deems appropriate based on reported errors. Licensor shall use its best efforts to respond to Licensee's notification of material errors on the same day as notification is given to Licensor or on the following day.

g) All Software Support shall be performed during the Service Hours unless other arrangements are mutually agreed to by the parties in writing. "Service Hours" shall mean the hours of 7:00 AM through 7:00 PM CT. After normal "Service Hours", Licensor will provide support for critical service issues, via pager, cellular phone or other means of communications.

h) Licensor will provide reasonable technical support by telephone concerning use of the Programs and diagnosis of problems or errors.

i) Licensor shall provide Licensee with telephone number(s) and/or other contact information in order to allow Licensee to accomplish the required notification and request information.

j) Software Support does not entitle Licensee to Software Modules available from Licensor which are designed to increase the number of terminals, to add additional applications or to cover business functions that are not included in the Program currently licensed to Licensee. Such Software Modules may be licensed from Licensor. If such additional Software Modules are licensed by Licensee, Releases relating to them will be available as part of Software Support under this Agreement upon current payment of the then current Software Support Fees for such Modules.

A-23

k)    Licensor agrees to provide adequate response time to requests for support based upon the standards as identified below in Paragraph 2 – ERROR CORRECTION STANDARDS. If extended research is required, Licensor will notify Licensee and provide estimated time of resolution. Provided Licensee uses the standard procedures for requesting customer support, Licensor will track all software support requests and will provide Licensee with access to the tracking software utilized.

## 2.    ERROR CORRECTION STANDARDS.

Licensor shall provide Licensee error correction services for the Program as set forth below:

a)    A **Level 1 Program Error** shall be deemed to have occurred when there exists an error in the Program that substantially impacts beneficial use of the Program by users for a core business function. Within one (1) business day of Licensor's receipt of notice of a Level 1 Program Error, Licensor shall have responded and assigned personnel with appropriate technical expertise to diligently and continuously work with appropriate personnel of Licensee to correct the error or reach a mutually acceptable workaround.

b)    A **Level 2 Program Error** shall be deemed to have occurred when there exists an error in the Program that intermittently impacts beneficial use of the Program by users, but does not render the Program inoperative. Within two (2) business days of Licensor's receipt of notice of a Level 2 Program Error, Licensor shall have responded and assigned personnel with appropriate technical expertise to diligently and continuously work with appropriate personnel of Licensee to correct the error or reach a mutually acceptable workaround.

c)    A **Level 3 Program Error** shall be deemed to be a minor error in the Program that is not a Level 1 or Level 2 Program Error. Licensor shall respond to notices of Level 3 Program Errors in accordance with the rendering of technical support as set forth above.

## 3.    CONDITIONS OF SOFTWARE SUPPORT.

The following terms and conditions shall apply at all times while Software Support is in effect:

a)    Licensee shall provide Licensor with access at the site to its computer hardware, system software, the Program and Licensee data files with sufficient workspace required to perform the Software Support services. Licensee shall also provide sufficient electrical current, telephone and power outlets for Licensor's use in performing Software Support.

b)    Licensee shall supply Licensor with access to the computer hardware, system software, the Program and Licensee data files through the use of the Internet, telephone line(s) and/or modem(s). Licensee must equip the computer system with hardware and communications software approved by Licensor capable of originating telephone calls to and receiving calls from Licensor. Specification for suitable communications hardware and software are available from Licensor on request.

c)    Licensee shall designate an individual who shall be the System Manager. The System Manager must have a working knowledge of the Program and the system hardware and will be responsible for the computer system backups, user access, and for recording and reporting errors and malfunctions.

A-24

# **Schedule B -- Pricing**

1.    **Number of Licensed Users**

The initial Software License granted Licensee is determined as follows:
a)    One-Hundred (100) Concurrent LOS Users
b)    Two (2) Non-Production Users

2.    **Software and Software Support Payment Schedule**

a)    Licensee shall pay a License Fee of One-Hundred Ninety Thousand Dollars ($171,000) for the initial Software License granted.

b)    Additionally, Licensee shall pay a Quarterly Software Support Fee of $8,550 for the initial Software License granted.

These amounts shall be payable as follows:

i.    Initial payment of $85,500 is due upon execution of this agreement.
ii.    The balance of $85,500 is due four months from the date on this License Agreement.
iii.    On the six-month anniversary of this License Agreement, and each quarter thereafter, Quarterly Software Maintenance equal to 5% of the then current License fee of the total accumulated software costs is due.

c)    If any amounts are not paid within 30 days after the date such amounts are due, Licensee agrees to pay late charges at a rate of eighteen (18%) per annum of the amount unpaid as a late penalty; provided, however, that in no event shall such charges exceed the maximum interest rate allowed by law.

d)    In the event Licensee shall fail to pay the fees and other charges due to Licensor hereunder when due, Licensor may, at its option, refuse to provide further services to Licensee under this agreement until such time as Licensee shall have paid any past due fees and other charges to Licensor.

3.    **Option to Purchase Additional Software**

a)    Licensee is granted the option to purchase additional Software Licenses at $1,700 per license seat.
b)    At such time as the number of Software Licenses equals (150), additional Software Licenses may be purchased for $1,500.

4.    **Software Support Advance Payments**

a)    Quarterly charges for Software Support are payable in advance. Software Support is provided free for the initial users during the first six months from the execution date of this agreement. Payment of the above Software Support fees will provide Licensee with Software Support until the Expiration Date, which is a period equal to three (3) months. In the event Licensee shall fail to pay the fees and other charges due to Licensor hereunder when due, Licensor may, at its option, refuse to provide further services to Licensee under this agreement until such time as Licensee shall have paid any past due fees and other charges to Licensor.

b)    Software Support for additional software purchases will be due and payable in advance and prorated quarterly.

c)    Software Support will be calculated at Licensor's then current rate. Licensor's current Software

A-25

Support fee rate is twenty (20) per cent per annum, which is collected quarterly ; however Licensor reserves the right to change the rate of Software Support with ninety (90) days written notice.

**5.     Web-Enabled Licenses**

a) .     Licensor utilizes a thin client application server to deploy the Program to remote users as well as to local users. The additional cost for this application is $160 per Licensed Concurrent User for the first year and an annual maintenance charge of $20 each year thereafter. Following installation of the software, Licensee will be invoiced $160 for each Licensed User identified in paragraph 1 a) above.

b)     Should Licensee desire fewer web-enabled access licenses for local or remote users, written notification to Licensor must be provided in advance of installation of the software.   In lieu of this application server, Licensee may utilize Citrix or Terminal Services and no additional charges will be incurred.

**6.     Project Management, Training, and Implementation Services**

a)     Licensee acknowledges that a successful implementation of Licensor's Program requires Licensee to make a minimum commitment in the use of Licensor's resources. More specifically, Licensee agrees to utilize Licensor's Project Management, Training, Implementation services which are outlined as follows:

   i)     **Project Management** – Licensee agrees to utilize a designated, qualified resource of Licensor who will act in its capacity as the Project Manager throughout Licensee's implementation. Licensor's designated Project Manager will co-manage the project on a time and materials basis (estimated to be 2-3 hours per week for 12 weeks) in conjunction with a designee of Licensee. Additionally, Licensee further agrees to utilize Licensor's web accessible project management software, Microsoft Project, as the primary tool for the specific purpose of tracking and monitoring all aspects of Licensee's implementation project. The cost for Project Management is billed at the rate specified in Schedule F.

   ii)     **Training** – Licensee agrees to utilize qualified resources of Licensor who collectively will act in its capacity as Trainers throughout Licensee's implementation. Licensors designated Trainers will be utilized for the specific purpose of providing the following trainings:

      a)     System Administration Training (SAT) – This required training provides Licensee's implementation team instruction in the definition, configuration, and use of the Program. This classroom style training consists of three (3) sessions ranging from three to five days each, with each one providing for a combination of instruction and "hands on" use. All sessions of SAT are required to be taken by the Licensee's implementation team members whose collective responsibilities are to assist in performing their respective assigned tasks during the implementation. Additionally, certain members of Licensee's implementation team will also be responsible for providing for the ongoing support and maintenance of the Program on Licensee's behalf, which will commence with the actual use of the Program in a production environment, a.k.a. "Go Live". The cost of System Administration Training is billed at the rate specified in Schedule F.

      b)     Custom Development Training (CDT) – This optional, minimum of eight to ten days, training provides Licensee's designated technical team members instruction in the definition, configuration, syntax, and the API for the tools used to customize the Program through the development of documents, formulas, utilities, interfaces, tasks, etc... This classroom style training consists of one session lasting four to five days, which provides for a combination of instruction and "hands on" use. Additionally, a minimum of one session lasting four to five days of real case

A-26

application co-development with a developer of Licensor is required within 30 days of CDT. Licensee agrees that its designated personnel participating in CDT must possess general programming skills. This training is conducted on your site and is billed at the rate specified in Schedule F. Additional or supplemental training classes are provided at Licensor's facility each month and are billed at the rate specified in Schedule F for up to two people.

iii)  **Implementation** – Licensee agrees to utilize qualified resources of Licensor for a minimum of 10 business days during implementation. The cost of these services is billed at the rate specified in Schedule F. Licensor's implementation personnel will collectively assist in the ongoing configuration and definition of the Program throughout Licensee's implementation. Licensors designated implementation resources will be utilized for the specific purpose of providing the following:

a)  Specific guidance as to the system's deployment, and how to best utilize/modify existing out-of-box functionality.

b)  Specific guidance and insight as to what other clients of Licensor have done with the Program, both successfully and unsuccessfully.

c)  Assistance in the definition/configuration of investor/product guidelines, workflow, distribution channels, pricing models, fees, security, document assignments, and contact management (i.e., rolodex/managed vendors).

d)  Assistance in understanding the nuances of the credit reporting and AUS mechanisms as implemented by the Program.

e)  Assistance in identifying and escalating issues that have the potential to delay the implementation.

f)  "Hands on" guidance to newly trained administrators and team members.

g)  Assistance in identifying required customizations of or appropriate workarounds for the Program.

h)  Guidance to Licensee's Information Technology specialists as it relates to technology issues.

i)  Assistance in communications between Licensee and Licensor.

b)  Licensee agrees to pay Licensor for all project management, training, implementation expenses on a weekly basis based on the time and materials used as well as reimburse Licensor for the cost for reasonable travel expenses related to airfare, car rental and standard per diem for hotels and meals as provided in IRS Publication 1542 which is also available on the IRS web site at www.policyworks.gov/perdiem.

c)  If requested by Licensee in writing, Licensor will provide additional training and implementation services at the rate specified in Schedule F. Forms and report creation will be billed at the rate specified in Schedule F.

d)  Licensor reserves the right to change the billable rate on any of the services listed in Schedule F with notice.

7.  **Customization**

a)  If requested by Licensee in writing, Licensor will provide additional custom programming, custom document creation, custom interfaces and data mapping services at the billable rate specified in Schedule F.

b)  Licensor will provide all existing interfaces, templates, screens and forms to Licensee, as is, at no additional cost to Licensee. If desired, Licensor will provide additional customization to any of the above based on the appropriate rate specified in Schedule F.

c)  Licensor will furnish any custom programming requested by Licensee on a mutually convenient schedule based upon the availability of Licensor's personnel and current work schedule.

A-27

    d)     Licensor may renegotiate the billable rates listed in Schedule F based upon the purchase of a block of hours of most of the listed services.

    e)     Licensor reserves the right to change the billable rate on any of the services listed in Schedule F with notice.

## 8.   Miscellaneous

    a)     Licensor will provide any documents currently in its library at no additional cost to Licensee. These documents consist of most but possibly not all of the standard documents for FNMA, FHLMC, VA and FHA and are kept in compliance by the forms supplier, which is either Wolters Kluwer Financial Services (formerly VMP) or Harland GreatDocs. The licensing and licensing expense of these documents shall be the responsibility of Licensee.

    b)     This agreement will expire if not fully executed on or before April 30th 2007.

A - 28

# <u>Schedule - C</u>

## California Financial Group/ Integra Hardware Configuration

Licensee recognizes that the hardware/software configuration below is considered by Licensor to be acceptable, whether or not recommended by Licensor, for operating the Program(s) provided in the Agreement. Licensor further makes no guarantees or warranties with respect to the configuration listed below. Licensee is solely responsible for the purchase, licensing, installation, configuration of all hardware and third party software.

➤ Database Server --
   Single Intel® Xeon™ processor at 3.0GHz/8MB Cache
   6GB RAM
   Spilt Backplane with RAID 1 and RAID 5
   RAID for 1 OS   RAID 5 for DATA
   74 GB + 15,000 RPM / SCSI hot pluggable HD
   74 GB + 15,000 RPM / SCSI hot pluggable HD
   146 GB + / 15,000 RPM / SCSI hot pluggable HD
   146 GB + / 15,000 RPM / SCSI hot pluggable HD
   146 GB + / 15,000 RPM / SCSI hot pluggable HD
     (Raid 5 or better)
   Dual Channel Array controller / 256 Cache
   Redundant power supply
   100/1000 Network Adapter
   Windows 2003 server
   MS SQL 2005 Standard
   Veritas Net backup or similar

➤ Terminal Servers\ Web servers -
   Single Intel® Xeon™ processor at 3.16GHz/1MB
   4 GB RAM
   74GB / 15,000 RPM / SCSI hot pluggable HD
   74 GB / 15,000 RPM / SCSI hot pluggable HD
     Raid 0 / Write Cache
   Dual Channel Array controller
   Redundant power supply
   100/1000 Network Adapter
   Windows 2003 Server
   IIS

➤ Product Server – (Workstation Class)
   Pentium IV 2.4 GHz with 512K Cache
   2 GB RAM
   10 GB / 10,000 RPM
   Windows 2000

➤ Communication Servers- (Workstation Class)
   (DU, LP, Credit)
   Pentium IV 2.4 GHz with 512K Cache
   1 GB RAM

Rev. 1/4/07           – 18 –

A-29

        10 GB / 10,000 RPM
        Windows 2000

➢ Workstations-
        Pentium III 500 MHz and above
        512 MB of RAM
        Windows 2000. NT. or XP

➢ Network
        100/1000 Backbone
        100 MB at each workstation

A - 30

# Schedule –D

# Product Manager Setup & Maintenance

### Product Manager
As an additional optional service, Licensor will setup and maintain the Destiny Product Manager with program guidelines for FNMA, FHLMC, VA, FHA and any investor, under the following terms:

**Setup** – Licensor will provide FNMA, FHLMC, VA, and FHA guidelines as well as any existing investor program guidelines at no cost. These programs and guideline sets have been previously disclosed in writing to Licensee. In addition, all currently available loan programs guidelines from the following investors will be added at an additional one-time, flat rate cost of $5,000. These investors are: Greenpoint, Impac, InterFirst, Flagstar and IndyMac. Thereafter, Licensor will provide any additional program guidelines to Licensee according the following schedule:

| | |
|---|---|
| Products 1 – 20 | $100 per product |
| Products 21 – 50 | $50 per product |
| Products 51 or more | $25 per product |

**Guideline Maintenance** - Licensee may request Licensor to maintain all investor product guidelines provided by Licensor for Licensee with any additions, deletions or changes to these guidelines on a regular basis. There is a minimum one year commitment for this service, which is billed monthly at the current rate of $1,000 per month plus fees per the following schedule based on number of products:

| | |
|---|---|
| Products 1 – 20 | $50 per product |
| Products 21 or more | $10 per product |

**Pricing Setup and Maintenance** - If desired, Licensor will setup an ongoing feed for Base Pricing Only for a one-time fee of $2,500. This setup assumes an electronic feed of regular base pricing provided in an excel (.csv) or XML mutually agreed upon formatted file. Pricing adjustment guidelines are available at our current rate of $200 per hour. These are provided by Licensee or an authorized third party on a case-by-case negotiated basis.

A-31

# **Schedule –E**

*<This page intentionally left blank>*

A-32

# Schedule –F

## Summary of Fees for Services

| One-time charges for implementation services | | Rate |
|---|---|---|
| Project Management | Oversee implementation from contract to go-live date | $175 / hr. |
| System Administrator Training | Three different sessions of 3 – 5 days each, on your site. | $200 / hr. |
| Implementation Services | Minimum 10 days of configuration and definition of the system | $200 / hr. |
| **Optional charges for miscellaneous services** | | **Rate** |
| Business Analyst Consulting | Review current business processes and provide suggestions for improvement | $200 / hr. |
| Train the trainers training | Four days or more (if necessary) of training the administrators of the system on how to train the staffs. | $175 / hr. |
| Customization Training A | Two sessions of 4 – 5 days of hands on instruction on customizing the application, documents and screens at your site. | $200 / hr. |
| Customization Training B | Group training at Integra site (conducted monthly) Limited to 2 people at this price. | $150 / hr. |
| End-User Training | Four days or more (if necessary) of training the users on the system. | $175 / hr. |
| User Acceptance Training | Use and testing of the system based upon your configurations and settings | $175 / hr. |
| Client System Testing | Rigorous analysis of your overall system | $200 / hr. |
| Crystal Report Training | Training in the design of custom Crystal Reports | TBD |
| Custom Screens | We will design custom screens for you per your specifications | $175 - $200 / hr. |
| Custom Forms | We will design custom forms for you per your specifications | $150 / hr. |
| Crystal Reports Development | We will design custom reports for you per your specifications | $150 / hr. |
| Custom Interfaces | We will design custom interfaces for you per your specifications | $175 / hr. |
| Custom Programming | We will develop any custom LOS application or utility for you | $175 - $200 / hr. |
| Custom Web Development | We will design, build or modify your website to meet your needs | $200 / hr. |
| IT Services | We will assist you with your database or hardware configuration needs | $200 / hr. |
| Network and hardware documentation | We will document your system configuration for daily maintenance, logging and disaster recovery purposes | $175 / hr. |

A-33

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Richard T. Bowles/Veronica Ann O. Benigno 46234/238053
Bowles & Verna LLP
2121 N. California Blvd., Suite 875
Walnut Creek, CA 94596
TELEPHONE NO.: 925-935-3300    FAX NO.: 925-935-0371
ATTORNEY FOR *(Name):* Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME:

CASE NAME: Wholesale America Mortgage v. Integra
Software Systems, LLC

**ENDORSED**
**FILED**
ALAMEDA COUNTY

MAY 0 1 2008

CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited   [ ] Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | RG08385260 |
| | | JUDGE: |
| | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify):* 4
5. This case [ ] is [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 1, 2008

Veronica Ann O. Benigno ▶ [signature]
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | Martin Dean's ESSENTIAL FORMS™ | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |

2654-002

A-34

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)-Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice-Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach-Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case-Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ-Administrative Mandamus
  Writ-Mandamus on Limited Court Case Matter
  Writ-Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal-Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400-3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

Martin Dean's ESSENTIAL FORMS™

2654-002

A-35

# Exhibit  B

LEXSEE 2007 U.S. DIST. LEXIS 5902

**FRIGATE LIMITED, Plaintiff, v. CECILIA L. DAMIA, Defendant.**

**No. C 06-04734 CRB**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 5902*

**January 12, 2007, Decided
January 12, 2007, Filed**

**COUNSEL:** [*1] For Frigate Limited, an Isle of Man corporation, Seamark Trust Company (CI) Limited, Trustee of The Cecilia L. Damia Family Trust Agreement and The Emil Damia Family Trust Agreement, Plaintiffs: Bryan Dirk Sampson, LEAD ATTORNEY, Sampson & Associates, San Diego, CA; Mary L. Fickel, Sampson & Associates, San Diego, CA US.

For Cecilia L. Damia, Defendant: Andrew Field Pierce, LEAD ATTORNEY, Pierce & Shearer LLP, Palo Alto, CA.

For Cecilia L. Damia, Counter-claimant: Andrew Field Pierce, Pierce & Shearer LLP, Palo Alto, CA.

For Frigate Limited, an Isle of Man corporation, Seamark Trust Company (CI) Limited, Trustee of The Cecilia L. Damia Family Trust Agreement and The Emil Damia Family Trust Agreement, Counter-defendants: Bryan Dirk Sampson, LEAD ATTORNEY, Sampson & Associates, San Diego, CA; Mary L. Fickel, Sampson & Associates, San Diego, CA US.

**JUDGES:** CHARLES R. BREYER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES R. BREYER

**OPINION**

**ORDER**

Now pending before the Court is Plaintiff's motion to dismiss Defendant's second counterclaim. For the reasons set forth below, that motion is DENIED.

**BACKGROUND**

In 1991, Cecilia Damia and her husband, Emil Damia, who is now deceased, [*2] established two trusts: the Cecilia L. Damia Family Trust and the Emil Damia Family Trust (collectively, the "Damia Family Trusts"). Into these trusts they placed certain assets, including their interest in a number of convalescent hospitals located in Northern California. Under the terms of the agreements establishing the trusts (the "Trust Agreements"), they relinquished all rights to these assets and gave them to a trustee for management. The current trustee of the Damia Family Trusts is an Isle of Man company called Frigate Limited. Significantly, the Trust Agreements contain a provision requiring all disputes arising under them to be governed by the law of the Isle of Man, an island jurisdiction located off the coast of England. These Trust Agreements also contain a forum selection clause, which provides that any lawsuits arising under them shall be submitted to the jurisdiction of the High Court of the Isle of Man.

Following the establishment of the Damia Family Trusts, Cecilia Damia ("Damia") entered into several contractual agreements with the trustee, whereby the trustee effectively gave to her large sums of money out of the assets of the Damia Family Trusts. This case involves [*3] five such transactions:

. First, at the time that the trusts were established, the trustee and Damia signed a Private Annuity Agreement, under which the trustee agreed to provide Damia with a monthly annuity of approximately $ 19,000.

. Second, in April of 2003, the trustee provided Damia with a loan of $ 630,000. The parties executed a promissory note requiring all disputes arising in connection with the loan to be resolved in Cali-

*B-36*

fornia courts. According to the trustee, Damia has failed to repay this loan.

. Third, at some point in 1999, the trustee provided Damia with another loan so that she could purchase and maintain certain property in Costa Rica. According to the trustee, Damia has never provided any documentation of the putative purchase of this property, and there remains an unpaid balance of approximately $ 250,000 on this loan.

. Fourth, in April of 2004, the trustee provided Damia with an additional loan of $ 50,000. According to the trustee, Damia has refused to sign a promissory note on this loan and has failed to repay any portion of it.

. Fifth, in June of 2004, the trustee and Damia entered into a so-called "Service Agreement." Under the [*4] terms of the Service Agreement, Damia agreed to provide certain management services in connection with the convalescent hospitals owned by the trust. In particular, she agreed to provide quarterly accountings and to manage certain bank accounts pertaining to these hospitals. In exchange, the trustee agreed to provide Damia with a monthly stipend of $ 5,000.

The trustee filed suit in August of 2006, alleging that Damia had failed to live up to her end of the last four of bargains. Specifically, the trustee asserted causes of action for her failure to comply with their agreement as to the $ 630,000 loan (Claims 1 and 5), the Coast Rica loans (Counts 2 and 6), the $ 50,000 loan (Claims 3 and 7), and the Service Agreement (Counts 4 and 8).

Defendant counterclaimed. She asserts three causes of action: (1) that the trustee breached the Service Agreement, (2) that the trustee breached its fiduciary duty under the Trust Agreements; and (3) that the trustee breached the Private Annuity Agreement by discontinuing her monthly annuity of $ 19,000. Moreover, as an affirmative defense to the trustee's claims, Damia alleges that she is excused from performance under these various contracts [*5] because the trustee breached its obligations under the Trust Agreements.

Now pending before the Court is Defendant's motion to dismiss Plaintiff's second counterclaim. Defendant argues that this particular counterclaim must be dismissed because it arises under the Trust Agreements, which require the submission of any disputes arising

under them to the High Court of the Isle of Man. In other words, Defendant contends that the counterclaim relating to the breach of its fiduciary duty cannot be heard in this Court in connection with this lawsuit, and must be heard if at all in the Isle of Man, because it arises under the Trust Agreements, and not under the distinct contractual agreements that form the basis for Plaintiff's original complaint.

## DISCUSSION

Under Ninth Circuit law, a motion to dismiss based on a forum selection clause is treated as a challenge to venue under *Rule 12(b)(3)*, and the district court therefore may consider facts and pleadings outside the scope of the complaint. *Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 324 (9th Cir. 1996).* Generally, courts will enforce a forum selection clause, even one that requires submission of the dispute to [*6] a foreign court, unless the party challenging the clause can clearly show that its enforcement would be "unreasonable under the circumstances." *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972).* Consistent with the "presumption in favor of enforcing [a] forum selection clause," *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc., 915 F.2d 1351, 1355 (9th Cir. 1990),* the Ninth Circuit has held that a forum selection clause must be enforced unless the party opposing it clearly shows (1) that the clause "was the result of fraud, undue influence, or overweening bargaining power," (2) that forum identified in the clause is "so 'gravely difficult and inconvenient' that the complaining party will 'for all practical purposes be deprived of its day in court,'" or (3) that enforcement of the clause would "contravene a strong public policy of the forum in which the suit is brought." *Argueta, 87 F.3d at 325* (quoting *Bremen, 407 U.S. at 18*; and citing *Carnival Cruise Lines v. Shute, 499 U.S. 585, 591, 111 S. Ct. 1522, 113 L. Ed. 2d 622 (1991)).*

Here, the Court concludes that enforcement of the forum selection clause in the Trust [*7] Agreements would be "unreasonable under the circumstances" of this peculiar case. *Bremen, 407 U.S. at 10.* If the Court dismisses Damia's counterclaim, she will be forced to litigate the case simultaneously in the Isle of Man. Moreover, because Damia asserts the basis for the counterclaim as an affirmative defense against the trustee's claims, this Court may address and decide many of the issues presented in the counterclaim. Under these circumstances, the instant proceedings may well have preclusive effect on any subsequent proceedings in the Isle of Man, and Damia may be effectively "deprived of [her] day in court" as to that counterclaim. *See Argueta, 87 F.3d at 325.*

*B-37*

For similar reasons, the Court also finds that the enforcement of the forum selection clause in the Trust Agreements would be contrary to sound judicial policy. A plethora of legal rules and doctrines are designed to promote the efficient resolution of controversies. *See, e.g., Fed. R. Civ. P. 18* (permitting the joinder of related claims and remedies); *Fed. R. Civ. P. 19* (requiring the joinder of persons [*8] needed for just adjudication of a controversy); *Fed. R. Civ. P. 20* (permitting joinder); *Fed. R. Civ. P. 22* (allowing interpleader for interested parties); *28 U.S.C. § 1291* (requiring a "final order" by the district court so as to avoid piecemeal or unnecessary litigation of appeals). Compelling Damia to litigate the same issues in a different jurisdiction halfway around the world, when this Court is adjudicating those very same issues at the trustee's own behest, is needlessly inconvenient and burdensome; requiring such duplicitous litigation is plainly contrary to the policy of the federal judiciary of promoting the consistent and complete adjudication of disputes. To the extent that it has been deprived of the benefit of the forum selection clause in the Trust Agreements, the trustee has only itself to blame--by entering into contracts with the settlor, even though she may have been acting in a distinct and unrelated role, the trustee itself created the specter that its fiduciary duty under the Trust Agreements would be invoked in a dispute. The trustee cannot enter into multiple [*9] agreements, all of which pertain to the same set of assets and bind the same parties (albeit perhaps acting in different roles), and then complain that they contain mutually incompatible forum selection clauses. *Cf.Adam v. Saenger, 303 U.S. 59, 67-68, 58 S. Ct. 454, 82 L. Ed. 649 (1938)*

("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence."). The trustee has identified no case, and this Court is aware of none, in which a plaintiff first filed suit and then successfully invoked a forum selection clause to exclude counterclaims as to the very same subject matter.

Of course, the Court makes no determination at this point whether the Trust Agreements and the other contracts are so closely intertwined or related that a breach of one might excuse performance under another. The point here is merely that the agreements between the trustee and Damia (whether acting as settlor or as third-party) involve overlapping facts and require a resolution of the parties' respective rights [*10] as to the very same property; under these circumstances, it would be unreasonable to require the extraction and exportation one set of issues for independent resolution by a foreign court. For this reason, the Court exercises its discretion not to enforce the forum selection clause, *see Transamerica Airlines, 915 F.2d at 1353*, and Plaintiff's motion to dismiss Defendant's second counterclaim is hereby DENIED.

**IT IS SO ORDERED.**

Dated: January 12, 2007

CHARLES R. BREYER

UNITED STATES DISTRICT JUDGE

# Exhibit C

LEXSEE 1998 U.S. DIST. LEXIS 8002

**SOIL SHIELD INTERNATIONAL, INC., Plaintiff, v. LILLY INDUSTRIES, INC.,
et al., Defendants.**

**No. C 98-1353 SC**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

*1998 U.S. Dist. LEXIS 8002*

**May 26, 1998, Decided
May 29, 1998, Filed; May 29, 1998, Entered in Civil Docket**

**DISPOSITION:** [*1] Lilly's motion to dismiss for improper venue GRANTED.

**COUNSEL:** For SOIL SHIELD INTERNATIONAL, INC., Plaintiff: Stephen F. Heller, Paul Kozachenko, Golsalves & Kozachenko Fremont, CA.

For LILLY INDUSTRIES, INC., defendant: Justs N. Karlsons, Garrett Sanderson, III, Carroll Burdick & McDonough LLP, San Francisco, CA.

**JUDGES:** Samuel Conti, United States District Judge.

**OPINION BY:** Samuel Conti

**OPINION**

*ORDER RE LILLY'S MOTION TO DISMISS FOR IM-
PROPER VENUE*

### I. INTRODUCTION

Plaintiff Soil Shield International, Inc. ("Plaintiff") brings suit against Lilly Industries, Inc. and Guardsman Products, Inc. ("Defendants") for breach of contract. The suit arises from a contract for the sale of certain of Plaintiff's assets to Defendants. The contract includes an Escrow Agreement (the "Agreement") which Plaintiff claims Defendants breached. Defendants move for dismissal based on improper venue because the Agreement contains a forum selection clause requiring that all suits arising from the Agreement be brought in Michigan. Plaintiff argues that Defendants have waived any objection to venue and that Defendants' willful breach of the Agreement invalidates the forum selection clause. Plaintiff also [*2] requests that the Court defer any decision on proper venue until trial.

### II. BACKGROUND

In December of 1994, Plaintiff and Guardsman Products, Inc. entered into a written agreement for Plaintiff to sell certain assets to Guardsman. [1] In January of 1995, they entered into two additional written agreements, one of which was an Escrow Agreement under which Guardsman agreed to deposit into escrow shares of stock and cash in accordance with the terms specified in another agreement. The Agreement contains a forum selection clause in which the parties agree to the exclusive jurisdiction of the Circuit Court for Kalamazoo County, Michigan and the United States District Court for the Western District of Michigan for claims arising from the Agreement.

> 1 Guardsman merged with Lilly Industries, Inc. in 1996, and Lilly is Guardsman's successor in interest in this suit.

Plaintiff filed suit against Defendants on March 4, 1998 in California state court. Plaintiff alleges that Defendants breached the Agreement [*3] by refusing to release funds in the escrow account to Plaintiff in violation of the Agreement's terms. On April 3, 1998, Defendants removed the action to this Court. They now move for dismissal under *Fed. R. Civ. P. 12(b)(3)* for improper venue, because the forum selection clause in the Agreement requires claims under the Agreement to be brought in Michigan state or federal court. Plaintiff counters that Defendants have waived any objection to venue by removing the case to this Court, and contends that Defendants' willful breach of the Agreement invalidates the forum selection clause. Plaintiff also claims that, because of unresolved factual disputes over proper venue, the Court should defer its decision until trial.

### III. LEGAL STANDARD

C-39

A motion to dismiss pursuant to a contractual forum selection clause is decided under federal law. *Manetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509, 513 (9th Cir. 1988)*. A court must treat such a motion as a Rule 12(b)(3) motion to dismiss for improper venue. *Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 324 (9th Cir. 1996)*. A court can consider facts outside the pleadings and should not accept the pleadings as true. [*4] *Id.*

The United States Supreme Court has held that forum selection clauses are prima facie valid and should not be set aside unless the party challenging enforcement of such a provision can show that it is "'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972)*. Furthermore, the Ninth Circuit holds that "where venue is specified with mandatory language the clause will be enforced." *Docksider Ltd. v. Sea Technology, Ltd., 875 F.2d 762, 764 (9th Cir. 1989)*.

## IV. ANALYSIS

Plaintiff proffers two arguments to overcome the presumption that the forum selection clause is valid and enforceable. First, it argues that Defendants waived any objection to venue when they removed the case to this Court. Second, it claims that Defendants' wilful and malicious breach of the Agreement voids the forum selection clause. In the alternative, Plaintiff asks the Court to defer its decision on proper venue until trial.

### A. Waiver

Plaintiff cites Schwarzer's California Practice Guide on federal civil procedure and a number of federal cases to support its contention that Defendants waived any [*5] objection to venue by removing the case from California state court to this Court. Schwarzer and the federal cases are either inapposite or support Defendants.

Citing a number of federal court cases, Schwarzer notes that "removal constitutes a waiver of any venue objection by [the] defendant." Schwarzer, Tashima & Wagstaffe, CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 4:143, p.871 (1998). Unfortunately for Plaintiff, Schwarzer later states, "Despite removal, defendant may seek dismissal where a forum selection clause renders venue improper in the forum state." *Id.* at § 2:1049.2, p. 2d-171. Schwarzer actually supports Defendants' position.

Furthermore, none of the cases cited by Plaintiff concern the effect of removal on a forum selection clause. The cases which do hold that "the filing of a removal petition in a diversity action, without more, does not waive the right to object in federal court to the state court venue." *Lambert v. Kysar, 983 F.2d 1110, 1113*

n.2 *(1st Cir. 1993)*; see also, *Tanzman v. Midwest Express Airlines, Inc., 916 F. Supp. 1013, 1018 (S.D.Cal. 1996)*(calling this law "well settled").

The law is clear. Defendants have not [*6] waived any objection to venue by removing this action to federal court.

### B. Invalidation Through Wilful Breach

Plaintiff also argues that the forum selection clause is unenforceable because Defendants wilfully and maliciously breached the Agreement. Thus, Plaintiff claims, it would be unreasonable to enforce the clause.

In order for the Court to set aside the forum selection clause, Plaintiff must show that it is unreasonable under the circumstances. *Argueta, 87 F.3d at 325*. A forum selection clause is unreasonable if: (1) its inclusion in the contract was the result of undue influence, fraud or over-reaching; (2) the selected forum is so inconvenient that the complaining party will for all practical purposes be denied its day in court; or (3) enforcement would violate a strong public policy. *Id.*

Plaintiff has made no showing that inclusion of the forum selection clause in the Agreement resulted from any fraud or overreaching by Defendants. Plaintiff also offers no evidence that Michigan state or federal court is so inconvenient that Plaintiff will effectively be denied its day in court.

Plaintiff does argue that Defendants should not benefit from their own wilful [*7] and malicious breach of the Agreement by being able to defend the action in the forum of their choice. Plaintiff cites a number of California cases which hold that a party to a contract need not perform if the other party breaches first. These cases are irrelevant. The forum selection clause is not a substantive promise under the contract whose performance can be excused if one party breaches. Furthermore, Plaintiff fails to offer, nor is the Court aware of, any important public policy contravened by enforcing the forum selection clause here. Alleged breach by one party to a contract is insufficient to invalidate a forum selection clause in the contract on public policy grounds. The clause is enforceable.

### C. Deferring a Decision on Venue

Plaintiff asks that the Court defer any decision on venue until the time of trial. Because the Court finds no unresolved factual issues regarding venue, it will not do so.

## V. CONCLUSION

Based on the foregoing analysis, Lilly's motion to dismiss [*8] for improper venue is GRANTED.

C-40

IT IS SO ORDERED.

Dated: May 26, 1998.

Samuel Conti

United States District Judge

C-41

## PROOF OF SERVICE BY MAIL

1    I, Sherie Johnson, declare:

2    1. I am over the age of 18 and not a party to the within cause. I am employed

3
4    by King & Ballow in the County of San Diego, State of California. My business

5    address is 9404 Genesee Avenue; Suite 340; La Jolla, California 92037.

6    2. On June 5, 2008, I served a true copy of the attached document entitled

7
8    DECLARATION OF PAUL H. DUVALL IN SUPPORT OF DEFENDANT'S

9    MOTION TO DISMISS by placing it in a sealed envelope with postage fully

10
11   prepaid addressed as below and placed said envelope for collection and mailing on

12   that date following ordinary business practices:

13                          Richard T. Bowles, Esq.
                            Veronica O. Benigno, Esq.
14                          BOWLES & VERNA LLP
15                   2121 N. California Boulevard, Suite 875
                            Walnut Creek, CA  94596
16              Telephone:  925/935-3300; Facsimile:  925/935-0371
17           Attorneys for Plaintiff; WHOLESALE AMERICA MORTGAGE

18   3.    I am familiar with King & Ballow's practice for collecting and

19   processing correspondence for mailing. On the same day that correspondence is
20
21   placed for collection and mailing, it is deposited in the ordinary course of business

22   with the U.S. Postal Service in La Jolla, California.

23   I declare that I am employed in the office of a member of the bar of this court at
24
25   whose direction the service was made and I declare under penalty of perjury that the

26   foregoing is true and correct. Executed on June 5, 2008, at La Jolla, California.

27                                                   /S/ Sherie Johnson
28                                                   Sherie Johnson

- 1 -                                       PROOF OF SERVICE