RICHARD T. BOWLES (#46234)
STEVEN P. MCFARLANE (#240488)
VERONICA O. BENIGNO (#238053)
BOWLES & VERNA LLP
2121 N. California Boulevard, Suite 875
Walnut Creek, California 94596
Telephone: (925) 935-3300
Facsimile: (925) 935-0371
Email: rbowles@bowlesverna.com

Attorneys for Plaintiff
Wholesale America Mortgage dba California Financial Group

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHOLESALE AMERICA MORTGAGE, INC. dba CALIFORNIA FINANCIAL GROUP,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>INTEGRA SOFTWARE SYSTEMS, LLC, and Does 1-50, inclusive,<br><br>　　　　　Defendants. | **CASE NO.: C08-02720 MMC**<br><br>**DECLARATION OF RONALD PERKINS IN OPPOSITION TO DEFENDANT INTEGRA SOFTWARE SYSTEM, LLC'S MOTION TO DISMISS**<br><br>Date: July 18, 2008<br>Time: 9:00 a.m.<br>Place: Courtroom 7<br>Judge: Honorable Maxine M. Chesney |

I, RONALD PERKINS, declare as follows:

1.　　I am the President of Plaintiff Wholesale America Mortgage, Inc. dba California Financial Group ("CFG"). I have personal knowledge of the facts contained herein and could and would competently testify thereto if called upon to do so.

2.　　CFG is located in Pleasanton, California. It does not have any offices or employees in Davidson County, Tennessee.

3.　　Attached hereto as Exhibit A is a true and correct copy of the Software Licensing Agreement ("Agreement") entered into between CFG and Defendant Integra Software Systems, LLC ("Integra"). I signed the Agreement on behalf of CFG. Integra prepared the Agreement and presented it to me for signature. At the time, CFG was not represented by counsel, nor did I have the opportunity to consult with counsel. At the time I entered into the Agreement on behalf of CFG, I was not aware of

1    the forum selection clause in the Agreement. Integra did not point out its existence or indicate that one

2    was present in the Agreement. The forum selection clause was neither negotiated nor discussed.

3          4.      Integra affirmatively sought out CFG's business, by contacting and marketing their

4    products to CFG. After entering into the Agreement, Integra's employees/contractors performed certain

5    tasks at CFG's offices in Pleasanton, California. The facts and conduct underlying CFG's claims in this

6    lawsuit occurred in California, and the vast majority of percipient witnesses are in California.

7          5.      If CFG is forced to litigate this case in Tennessee, I expect the costs to be astronomical.

8    CFG's documents, employees, and witnesses are located in California. The cost of conducing litigation

9    in Tennessee will be prohibitive.

10      I declare under penalty of perjury of the laws of the State of California that the foregoing is true

11    and correct, to the best of my knowledge. Executed this 27th Day of June, 2008, at Pleasanton,

12    California.

13

14                       /s/ Ronald Perkins

                         Ronald Perkins

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

**DECLARATION OF RONALD PERKINS IN OPPOSITION TO DEFENDANT INTEGRA SOFTWARE
SYSTEM LLC'S MOTION TO DISMISS**

# EXHIBIT A

# Software Licensing Agreement

## 1.    INTRODUCTION

This is an Agreement between <u>Integra Software Systems, LLC of 117 Seaboard Lane, Suite F-290, Franklin, TN 37067</u> ("Licensor") and <u>California Financial Group of 2600 Stoneridge Mall Road, Suite 200, Pleasanton, CA 94588</u> ("Licensee") under which Licensor is licensing software on a non-exclusive basis for the Licensee's own use under the terms and conditions stated below.

## 2.    DEFINITIONS.

As used in this Agreement, the following definitions shall apply:

2.1.    "Agreement" shall mean this Agreement between Licensor and Licensee.

2.2.    "Authorized User" shall mean any officer, employee, or other party as designated by Licensor to act as an Individual LOS User, Concurrent LOS User, Non-Production User or System Manager of the Program.

2.3.    "Confidential Information" shall include all information relating to Licensor's and Licensee's businesses, products and services, including but not limited to data, trade secrets, discoveries, ideas, concepts, know-how, techniques, software (including the Program), business activities and operations, reports, studies and other technical and business information of Licensor and Licensee, and any other information clearly designated in writing as confidential by either party.   Without limitation of the foregoing, the parties agree that Confidential Information of Licensee includes, but is not limited to, all data and information regarding the customers and potential customers of Licensee, the identity of Licensee's customers and potential customers and all "nonpublic personal information" pertaining to Licensee's "customers" and "consumers" as such quoted or similar terms are defined in the Privacy Laws, (together, "Customer Data").

Confidential Information shall not include information that is: (i) at the time of disclosure to the receiving party hereunder, in the public domain; (ii) after disclosure to the receiving party hereunder, published or otherwise becomes part of the public domain through no fault of the receiving party; (iii) without a breach of duty owed to the disclosing party hereunder, is in the possession of the receiving party hereunder at the time of disclosure to the receiving party; (iv) received after disclosure to the receiving party hereunder from a third party who had a lawful right to and, without a breach of duty owed to the disclosing party, did disclose such information to the receiving party; or (v) independently developed by the receiving party hereunder without reference to or use of information which would otherwise constitute Confidential Information of the disclosing party hereunder.

2.4.    "Concurrent User" shall mean a user who is granted access to the Program, or any other application as defined in Section 9.2 of this Agreement, provided that the total number of simultaneous accesses granted under this Agreement has not been exceeded.

2.5.    "Effective Date" shall mean the date upon which both Licensee and a duly authorized officer of Licensor has approved and signed the Agreement.

2.6.    "Individual User" shall mean a user who is granted access to the Program, or any other application as defined by Section 9.2 of this Agreement, provided that the total number of accesses granted by individual authorizations on specified computers have not been exceeded.

2.7.    "Installation Date" shall mean the first day of initial installation and configuration of the software on Licensee's computer hardware.

2.8.    "License Fee" shall mean the fee for licensing the Program or Programs as specified in the attached Schedule B to the Agreement.

2.9.    "Non-Production User" shall mean a user who is granted access to the Loan Origination System (LOS) functionality for the express purpose of testing or evaluating new releases or custom programming changes.

2.10.   "Privacy Laws" means the federal law commonly referred to as the Gramm-Leach-Bliley Act (15 U.S.C. 601 et seq.), the implementing regulations issued in connection therewith, (12 CFR Part 40), as both are in effect from time to time, and all other federal and state laws and regulations pertaining to the confidentiality, use and/or disclosure of information by financial institutions, and all court, agency and administrative decisions, policies and proceedings related thereto, as may from time to time be in effect.

2.11.   "Program" shall mean all computer software, machine executable code, Scheme, Java or other language source code, configuration files, and associated documentation which is created by or supplied, either directly or indirectly, by Licensor including all Releases which are provided from time to time.

2.12.   The term "Release" shall mean a subset of a Version of the Program or any materials which are supplied by Licensor at or after the delivery of the Program, including any software provided for the purpose of improving the functions or performance of the Program, changing the intellectual property contained in the Program, expanding the capability or ease of operation of the Program, or for the purpose of fixing errors in program logic, or meeting regulatory requirements.

2.13.   The term "Software Support" shall mean support and maintenance services provided by Licensor as defined in Schedule A for Programs provided for in this Agreement.

2.14.   The term "Software Support Fee" shall mean that applicable Quarterly fee due for Software Support in accordance with Licensor's Software Support Schedule.

2.15.   The term "Version" shall mean a major application change to the Program which significantly alters the database structure, design or look and feel of the Program.

## 3.    GRANT OF LICENSE

3.1.    Licensor hereby grants to Licensee, and Licensee hereby accepts, a perpetual non-exclusive license to use the Program subject to the terms and provisions of this Agreement.

3.2.    The license granted by this Agreement authorizes use of the Program as specified in Schedule B.

3.3.    Licensee recognizes that Licensor will control the licenses granted by incorporating either software, hardware or a combination of both to work in conjunction with the Program to assist in the Licensor's protection against unauthorized use.

3.4.     The license granted by this Agreement authorizes use of the Program only on the computer hardware or similar hardware to that listed in the attached Schedule C to the Agreement ("Authorized Hardware").

3.5.     For Individual LOS User licenses only, one copy of the Program must be licensed for each computer or workstation on which the Program is installed.

3.6.     The Program may be installed on more than a single network and access may be permitted providing the Licensee complies with the terms stated in Schedule B.

## 4.     SCOPE OF THE AGREEMENT

This Agreement shall apply to each Program or Release of each Program that Licensee is currently licensing from Licensor or shall license in the future.

## 5.     COPIES OF THE PROGRAM

5.1.     Licensor shall furnish to Licensee one copy of the Program.

5.2.     Licensee shall be entitled to make additional copies of the Program to the extent necessary for use of the Program by authorized users on the Licensee's computer hardware. Licensee shall reproduce and include copyright or trade secret notices on any copies in the same text as stated in the copies provided to Licensee.

5.3.     Licensee is authorized to make additional copies of the Program to run on separate development and test environments for non-production use, as well as for disaster recovery

## 6.     INSTALLATION

6.1.     Initial installation of the Program on a computer shall be Licensor's responsibility. Subsequent installations of the software shall be Licensee's responsibility. Licensee shall follow the installation procedures as prescribed by Licensor.

6.2.     At such time that Licensor performs the initial installation of the Program, the following provisions shall apply: Licensor shall load the Program on Licensee's computer hardware and conduct Licensor's standard test procedures on the installed Program. Licensor shall be relieved of its obligation to perform the installation, until Licensee's computer hardware and operating system software are in good operating condition. Licensee shall provide Licensor with access to the computer hardware and electrical power, workspace and such other items as may be required to complete the installation.

## 7.     PAYMENT OF PROGRAM LICENSE FEE

In consideration of the license granted under this Agreement, Licensee shall pay to Licensor the License Fee as defined in Schedule B.

8.    **ACKNOWLEDGMENT OF LICENSOR'S OWNERSHIP RIGHTS**

All rights in the Program including but not limited to Confidential Information, trade secrets, trademarks, service marks, patents, and copyrights are, shall be and will remain the property of Licensor or any third party from whom Licensor has licensed software or technology. All copies of the Program delivered to Licensee or made by Licensee remain the property of Licensor.

9.    **RESTRICTIONS**

9.1.    Each party shall keep in confidence all Confidential Information of the other party and will not directly or indirectly disclose to any third party or use for its own benefit, or use for any purpose other than the performance of its obligations or exercise of its rights under this Agreement, any Confidential Information it receives from the other party. Each party shall use the same degree of care to protect the other party's Confidential Information as it would employ with respect to its own information of like importance which it does not desire to have published or disseminated, and in no event less than a reasonable degree of care. Licensee agrees to keep the Program in confidence and to take all reasonable precautions to ensure that no unauthorized persons, including but not limited to competitors of Licensor or other software development companies have access to the Program and that no unauthorized copies are made. Each party may make Confidential Information of the other party available to those of its employees, agents, contractors or service providers who have a need to know such information and who are subject to binding use and disclosure restrictions at least as protective as those set forth herein. Licensor shall provide the appropriate training to its employees and to its subcontractors, if any, to ensure compliance with this Agreement in all respects by Licensor, its employees, and its subcontractors, if any. Notwithstanding the foregoing, either party may make disclosures as lawfully required or requested by a court of law, or any governmental entity or agency in connection with seeking any governmental or regulatory approval or in connection with a judicial proceeding, provided that the party source of the Confidential Information is given prior notice sufficiently in advance of such disclosure to contest the disclosure, reasonable measures are taken to limit such disclosure and to obtain confidential treatment or a protective order and the party source of the Confidential Information is allowed to participate in such efforts. Either party may seek injunctive relief to enforce its rights under this Subsection.

9.2.    Licensee agrees that the database layout ("Schema") supplied with, and an integral part of, the Program is copyrighted by Licensor and specifically requires a license for each use, whether that use is by the Program, or any other application written or owned by Licensee or any other third party, which is intended for the specific purpose to add, change or delete data represented by the aforementioned Schema, whether in whole or any part thereof.

9.3.    Licensee may not alter any proprietary markings on the Program, including copyright, trademark, trade secret, and patent legends.

9.4.    Licensee may not de-compile, disassemble, or reverse engineer the Program.

9.5.        Licensee agrees to obtain prior written approval, which approval will not be unreasonably withheld, from Licensor before utilizing the services of any consultant or contractor to perform customizations or alterations to the program. Any customizations or alterations performed by anyone other than Licensor may invalidate any Warranty provided by Licensor and may also adversely affect the ongoing compliance and usability of the Program. Any modifications required by Licensor to correct any errors caused by the above customizations or alterations will result in charges based upon Licensor's then current rate for custom programming.

## 10.    LICENSEE'S OBLIGATION FOR DATA PROTECTION

10.1.       Licensee is required to perform daily backups of the data on the computer system used by the Program so that the likelihood of data loss is minimized. Licensee shall be solely responsible for backup software and hardware. Licensee shall provide the safe storage of all backup tapes and/or disks.

10.2.       Licensee shall be responsible for keeping its computer system free of computer viruses or any other hardware failures. Any loss of data resulting from computer viruses or any other hardware failures are the sole responsibility of the Licensee and are not covered under the Software Support agreement.

## 11.    WARRANTY

11.1.       Licensor owns all rights in and to the Program and Deliverables or has sufficient rights to grant the rights and licenses granted hereunder and has the full right, power and authority to grant such rights and licenses without the consent of any third party.

11.2.       Licensor warrants that the Program will perform materially in conformance with the user documentation supplied as part of the Program for any period in which Software Support is paid for and in effect under the terms of this Agreement ("Warranty Period").

11.3.       Neither the Program nor any Deliverable shall infringe any copyright, patent or trademark, misappropriate any trade secret, or otherwise infringe any intellectual property right of any third party. If all or any portion of the Program or any Deliverable becomes (or in the opinion of Licensee or Licensor may become) the subject of any claim or suit for infringement or violation (and in the event of any adjudication that the Program, Deliverable, or any portion thereof does infringe or if the use of the Program, Deliverable, or any portion thereof is enjoined), Licensor, at Licensor's sole expense and in addition to all other remedies available at law or under this Agreement, shall either: (a) procure for Licensee the right to use the Program, Deliverable, or the affected portion thereof; (b) replace the Program, Deliverable, or affected portion with other suitable software which is substantially similar to the Program, Deliverable, or affected portion in functionality and performance; or (c) modify the Program, Deliverable, or affected portion to make it non-infringing provided that the modified Program, Deliverable, or affected portion provides substantially the same functionality and performance as it did before such modification

11.4.       LICENSOR AND ANY THIRD PARTY FROM WHOM LICENSOR HAS LICENSED SOFTWARE OR TECHNOLOGY DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, WITH RESPECT TO THE PROGRAM AND THE ACCOMPANYING WRITTEN MATERIALS.

11.5.     LICENSOR AND ANY THIRD PARTY FROM WHOM LICENSOR HAS LICENSED SOFTWARE OR TECHNOLOGY WILL NOT BE LIABLE FOR LOST PROFITS, LOST OPPORTUNITIES, OR INCIDENTAL OR CONSEQUENTIAL DAMAGES UNDER ANY CIRCUMSTANCES.

11.6.     EXCLUSIVE REMEDY: LICENSEE'S EXCLUSIVE REMEDY AGAINST LICENSOR FOR ANY BREACH OF THIS AGREEMENT SHALL BE CORRECTION OF ANY ERROR OR DEFECT IN THE PROGRAM AS TO WHICH LICENSEE HAS GIVEN NOTICE.

11.7.     If any problem, operational failure or error of the Program has resulted from any alteration of the Program, accident, abuse, or misapplication, then this warranty shall be null and void, at Licensor's option.

## 12.    TRAINING

Upon delivery and installation, Licensor will provide Licensee with Training Services as specified on Schedule B upon the payment terms stated therein. Thereafter training services will be provided on the terms and at prices stated in Licensor's then current schedule of fees for training services.

## 13.    SOFTWARE SUPPORT

13.1.     Software Support for the Program shall consist of the services set forth on Schedule A hereto. Software Support shall be provided to mutually agreed upon "Authorized Users" of the Program.

13.2.     During the Warranty Period specified above, Licensee shall be entitled to software support. "Expiration Date" shall mean the date of the expiration of the Warranty Period and each subsequent anniversary of such date. Before each Expiration Date, Licensee shall be billed for the then applicable Quarterly Software Support Fee. If Licensee has paid the applicable Software Support Fee on or before the Expiration Date, Licensee shall be entitled to receive an additional three months of Software Support. Licensor shall have no obligation to provide Software Support 30 days after the Expiration Date if the applicable Quarterly Software Support Fee is unpaid.

13.3.     The Software Support Fee shall be sent to Licensor at the address set forth above, or such other address as Licensor may designate. Information as to the amount of the currently applicable Software Support Fee for the Program is available from the Licensor on request.

13.4.     Licensor's current policy is to support the most current Release of the software and the next prior Release; provided however that Software Support shall be provided on each Release for a minimum period of six (6) months.

13.5.     Licensee acknowledges and agrees that it may be necessary to update its computer hardware and/or operating system to achieve compatibility with the currently supported version. Licensee acknowledges and agrees that if it has allowed its subscription to Software Support to lapse, and if its version of the Program is not currently supported, it may have to obtain a current version to obtain Software Support, as is discussed below.

13.6.     If Licensee is not using a currently supported version of the Program, Licensor may suspend provision of Software Support for the Program until Licensee cures this condition without refunding the Software Support Fee.

13.7.    Licensee may terminate Software Support by written notice to Licensor prior to any Software Support Fee anniversary as defined in Schedule B, 2b. However, Licensor shall not be required to refund any Software Support Fee.

13.8.    If Software Support has been terminated or has lapsed, Licensee may reinstate its subscription to Software Support upon payment of the annual Software Support Fee in effect at the time, plus a reinstatement fee equal to 50% of the annual Software Support Fee in effect at the time. Upon reinstatement of Software Support, Licensee will be upgraded to the current version of the Program.

13.9.    Any installation required for an upgrade to a currently supported version of a Program under any paragraph of this Agreement, when performed by Licensor, will be charged to Licensee at Licensor's then current hourly rates plus reimbursement for any out-of-pocket costs or expenses incurred by Licensor. Such installation charges shall be in addition to other fees or charges that may be due.

## 14.    TERM AND TERMINATION

14.1.    The term of this Agreement shall commence upon the Effective Date and shall continue in effect until terminated as provided for herein. This document shall not become effective unless a duly authorized officer of Licensor has approved and signed the Agreement.

14.2.    It is agreed that either party may terminate this Agreement immediately upon written notice to the other party in the event that such other party (a) becomes insolvent or makes an assignment for the benefit of creditors; (b) files or has filed against it any petition under any Title of the United States Code or under any applicable bankruptcy, insolvency, reorganization or similar debtor relief law which is not discharged within thirty (30) days of said filing, or (c) requests or suffers the appointment of a trustee or receiver, or the entry of an attachment or execution as to a substantial part of its business or assets.

14.3.    Licensor may terminate this Agreement in the event Licensee (a) fails to make, when due, any License Fee payment or other payments required under this Agreement; (b) commits a material breach of any of its obligations concerning scope of use or the protection of the Program, intellectual property of Licensor, and Confidential Information; or (c) materially breaches any of its other obligations under any provision of this Agreement, which breach is not remedied within thirty (30) days after notice thereof by Licensor to Licensee.

## 15.    RIGHTS UPON TERMINATION

15.1.    Upon termination of this Agreement, Licensee's license to use the Program shall terminate, and Licensee shall immediately turn over to Licensor all copies of the Program, and any other Confidential Information relating to the Program and shall remove and erase completely any copies of the Program installed or recorded on any hard disk or other storage medium. Licensee shall promptly certify to Licensor in writing that it has complied with this requirement.

15.2.    Upon termination of this Agreement, Licensee shall pay to Licensor all fees due through the effective date of such termination. Unless otherwise specified herein or otherwise agreed in writing, all fees collected or accrued prior to the date of termination shall be retained by Licensor without any pro rata refund to Licensee.

15.3.    The termination of this Agreement shall not extinguish any rights or obligations of the parties relating to protection of Confidential Information.

## 16.   AUDIT

During the term of this Agreement and for a term of one year after termination, upon reasonable notice, Licensor may enter the premises of Licensee and perform reasonable audit and inspection procedures to confirm that Licensee is in compliance with the terms and conditions of the Agreement, including, but not limited to, provisions relating to scope of use of the Program, protection of Confidential Information, and termination. Licensee shall cooperate in any such inquiry.

## 17.   ESCROW AGREEMENT

Upon execution of this agreement, Licensor will enroll Licensee as a beneficiary under the technology escrow account established between Licensor and Iron Mountain Intellectual Property Management, Inc.. Licensee agrees to pay any enrollment charges and annual maintenance fees as required for all beneficiaries. Current annual maintenance fees are $500 per beneficiary, but are subject to change.

## 18.   ASSIGNMENT

18.1.   Licensee may not assign, in whole or in part, its rights granted in the Agreement without the express prior written consent of the Licensor, whereby that consent may be granted or withheld at the Licensor's sole discretion. Any purported assignment, except as provided for in this paragraph, shall be null and void and a material breach of this Agreement.

18.2.   The Licensee's assignment of this Agreement shall not discharge Licensee from its obligations, but shall make Licensee's assignee an additional obligor under this Agreement. Any assignment by Licensee will be invalid unless the assignee agrees in writing delivered to Licensor to be bound by and perform all obligations and terms of this Agreement.

## 19.   GENERAL PROVISIONS

19.1.   **Applicable Law.** This Agreement shall be construed pursuant to substantive law of the State of Tennessee.

19.2.   **Risk of Loss.** Upon delivery and installation of the Program, Licensee shall assume all risk of loss and damage to the Program, and shall at its sole cost and expense replace any lost or damaged portion thereof.

19.3.   **Taxes.** Licensee shall pay, in addition to the other amounts payable under this Agreement, all local, state and federal excise, sales, use, personal property, gross receipts and similar taxes (excluding taxes imposed on or measured by Licensor's net income) levied or imposed by reason of the transactions under this Agreement. Licensee shall, upon demand, pay to Licensor an amount equal to any such tax(es) actually paid or required to be collected or paid by Licensor.

19.4.   **Required Consents.** Licensee warrants that it has obtained lawful permission to use all hardware and software required in order for the Program to be used on Licensee's computer system.

19.5.    **Hardware and Third Party Software.** It is agreed that Licensee bears sole responsibility with respect to the adequacy, purchase, installation, configuration, performance, and maintenance associated with all hardware, operating systems, databases, and other third party software used in conjunction with the Program. Hardware or software recommendations made by Licensor are based on Licensor's experience, but due to variations in configuration and usage, Licensor cannot guarantee specific performances. Licensor is not responsible for installing, maintaining, or debugging third party hardware or software such as operating systems, servers, databases, or networks. Any request for assistance will be billable as custom work at Licensor's then current rate for custom programming. Any such work performed by Licensor is provided on a best efforts basis without warranty.

19.6.    **Public Reference.** Licensee consents to the public use of its name as a Licensee of Licensor as part of or pertaining to a customer list. Any use of Licensee name for advertising in any medium is restricted without prior Licensee approval.

19.7.    **Software Lock.** Licensee consents to acts by Licensor to disable the Program (including the triggering of software features that prevent operation of the Program) in the event that Licensee fails to pay the License Fee for the Program or uses or transfers the Program in breach of this Agreement. No such acts to disable the Program will be performed without written notice to Licensee from the Licensor.

19.8.    **Employee Solicitation.** Both parties mutually agree that during the term of this Agreement, for whatever reason, neither party will, directly or indirectly, solicit, seek or procure the services, whether as an employee or otherwise, of any employee or contracted individual of the other party who is or was employed by or contracted with the other party without the prior written consent of the other party, which may be withheld in the other party's sole discretion and upon such terms specified and agreed to in writing by the other party.

19.9.    **Required Acceptance by Officer of Licensor.** This Agreement is not binding upon Licensor until executed by an authorized representative of Licensor.

19.10.    **Modification.** This Agreement may not be modified or amended except in writing, which is signed by authorized representatives of each of the parties. No purported modification or amendment shall be binding until approved in writing and signed by an authorized representative of Licensor. This Agreement cannot be modified by e-mail correspondence.

19.11.    **No Waiver.** The failure of either party to exercise any right or the waiver by either party of any breach, shall not prevent a subsequent exercise of such right or be deemed a waiver of any subsequent breach of the same of any other term of the Agreement.

19.12.    **Notice.** Any notice required or permitted to be sent hereunder shall be in writing and shall be sent in a manner requiring a signed receipt, such as Federal Express, courier delivery, or if mailed, registered or certified mail, return receipt requested. Notice is effective upon receipt.

19.13.    **Force Majeure.** Neither party shall be deemed in default of this Agreement to the extent that performance of their obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortages of materials or supplies or any other cause beyond the control of such party ("Force Majeure") provided that such party gives the other party written notice thereof promptly and, in any event, within fifteen (15) days of discovery thereof and uses its best efforts to cure the delay. In the event of such Force Majeure, the time for performance or cure shall be extended for a period equal to the duration of the Force Majeure but not in excess of three (3) months.

19.14.    **Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter hereof and supersedes any prior oral or written promises or agreements. There are no promises, covenants or undertakings other than those expressly set forth in this Agreement.

19.15.    **Adequate Evaluation.** Licensee hereby acknowledges that it has been given ample opportunity, time, material, and access to the Program and Licensor's clients to adequately evaluate the Program.

19.16.    **Equitable Remedies.** The parties recognize that money damages is not an adequate remedy for any breach or threatened breach of any obligation hereunder by Licensee involving intellectual property, Confidential Information or use of the Program beyond the scope of the license granted by this Agreement. The parties therefore agree that in addition to any other remedies available hereunder, by law or otherwise, Licensor and any third party from whom Licensor has licensed software or technology shall be entitled to an injunction against any such continued breach by Licensee of such obligations.

19.17.    **Arbitration.** Any dispute relating to the terms, interpretation or performance of this Agreement (other than claims for preliminary injunctive relief or other pre-judgment remedies) shall be resolved at the request of either party through binding arbitration. Arbitration shall be conducted in Nashville, Tennessee under the rules and procedures of the American Arbitration Association ("AAA"). The parties shall request that the AAA appoint a panel of three arbitrators and, if feasible, include one arbitrator of the three who shall possess knowledge of computer software and its distribution; however the arbitration shall proceed even if such a person is unavailable.

19.18.    **Late Fees, Costs and Attorneys Fees.** A late payment charge of 1.5% per month, compounded monthly, shall apply to any payment due from Licensee that is in arrears for a period exceeding thirty (30) days. In any legal action or arbitration proceeding brought on any account, each party shall be responsible for their own costs of litigation or arbitration, including attorney's fees.

19.19.    **Exclusive Jurisdiction and Venue.** Any cause or action arising out of or related to this Agreement, including an action to confirm or challenge an arbitration award, may only be brought in the courts of applicable jurisdiction in Davidson County, TN at King & Ballow in Nashville, and the parties hereby submit to the jurisdiction and venue of such courts.

So agreed between the parties signing below.

Licensor: Integra Software Systems, LLC

By: _____

Name: _GERALD D. PRATT_

Title: _PRESIDENT_

Date: _5/21/07_


Licensee: California Financial Group

By: _____

Name: _Ronald D. Perkins_

Title: _President_

Date: _5/15/07_

# Schedule A - Software Support

## 1.    SERVICES PROVIDED.

Software Support shall consist of the following services:

   a)   Licensor shall assist Licensee in diagnosing errors and malfunctions, which occur when the Program is used by Licensee. Licensor is not responsible for errors or malfunctions caused by any hardware or any third party operating system.

   b)   Licensor shall provide support services to Licensee to attempt to correct diagnosed errors and malfunctions. Licensor shall attempt to provide Releases that implement corrections and shall attempt to assist Licensee in using the Program in a way that can avoid diagnosed errors, malfunctions and defects.

   c)   Licensor shall provide support services to Licensee to attempt to keep the Program compatible with the then current version of the operating system of the computer hardware.

   d)   Licensor may provide Licensee with new Releases for the Program licensed to Licensee. Releases may include new features and functions added to the Program and/or may provide corrections to errors or malfunctions. The timing and content of Releases will be at the sole discretion of Licensor.

   e)   Licensor will affect delivery of each Release to Licensee. All deliveries and shipments of Releases will be at Licensor's expense. The Licensee will install each Release at Licensee's expense.

   f)   Licensor will perform remote diagnostics when Licensor deems appropriate based on reported errors. Licensor shall use its best efforts to respond to Licensee's notification of material errors on the same day as notification is given to Licensor or on the following day.

   g)   All Software Support shall be performed during the Service Hours unless other arrangements are mutually agreed to by the parties in writing. "Service Hours" shall mean the hours of 7:00 AM through 7:00 PM CT. After normal "Service Hours", Licensor will provide support for critical service issues, via pager, cellular phone or other means of communications.

   h)   Licensor will provide reasonable technical support by telephone concerning use of the Programs and diagnosis of problems or errors.

   i)   Licensor shall provide Licensee with telephone number(s) and/or other contact information in order to allow Licensee to accomplish the required notification and request information.

   j)   Software Support does not entitle Licensee to Software Modules available from Licensor which are designed to increase the number of terminals, to add additional applications or to cover business functions that are not included in the Program currently licensed to Licensee. Such Software Modules may be licensed from Licensor. If such additional Software Modules are licensed by Licensee, Releases relating to them will be available as part of Software Support under this Agreement upon current payment of the then current Software Support Fees for such Modules.

k)      Licensor agrees to provide adequate response time to requests for support based upon the standards as identified below in Paragraph 2 – ERROR CORRECTION STANDARDS. If extended research is required, Licensor will notify Licensee and provide estimated time of resolution. Provided Licensee uses the standard procedures for requesting customer support, Licensor will track all software support requests and will provide Licensee with access to the tracking software utilized.

## 2.    ERROR CORRECTION STANDARDS.

Licensor shall provide Licensee error correction services for the Program as set forth below:

a)      A **Level 1 Program Error** shall be deemed to have occurred when there exists an error in the Program that substantially impacts beneficial use of the Program by users for a core business function. Within one (1) business day of Licensor's receipt of notice of a Level 1 Program Error, Licensor shall have responded and assigned personnel with appropriate technical expertise to diligently and continuously work with appropriate personnel of Licensee to correct the error or reach a mutually acceptable workaround.

b)      A **Level 2 Program Error** shall be deemed to have occurred when there exists an error in the Program that intermittently impacts beneficial use of the Program by users, but does not render the Program inoperative. Within two (2) business days of Licensor's receipt of notice of a Level 2 Program Error, Licensor shall have responded and assigned personnel with appropriate technical expertise to diligently and continuously work with appropriate personnel of Licensee to correct the error or reach a mutually acceptable workaround.

c)      A **Level 3 Program Error** shall be deemed to be a minor error in the Program that is not a Level 1 or Level 2 Program Error. Licensor shall respond to notices of Level 3 Program Errors in accordance with the rendering of technical support as set forth above.

## 3.    CONDITIONS OF SOFTWARE SUPPORT.

The following terms and conditions shall apply at all times while Software Support is in effect:

a)      Licensee shall provide Licensor with access at the site to its computer hardware, system software, the Program and Licensee data files with sufficient workspace required to perform the Software Support services. Licensee shall also provide sufficient electrical current, telephone and power outlets for Licensor's use in performing Software Support.

b)      Licensee shall supply Licensor with access to the computer hardware, system software, the Program and Licensee data files through the use of the Internet, telephone line(s) and/or modem(s). Licensee must equip the computer system with hardware and communications software approved by Licensor capable of originating telephone calls to and receiving calls from Licensor. Specification for suitable communications hardware and software are available from Licensor on request.

c)      Licensee shall designate an individual who shall be the System Manager. The System Manager must have a working knowledge of the Program and the system hardware and will be responsible for the computer system backups, user access, and for recording and reporting errors and malfunctions.

# Schedule B – Pricing

1.    **Number of Licensed Users**

The initial Software License granted Licensee is determined as follows:
a)      One-Hundred (100) Concurrent LOS Users
b)      Two (2) Non-Production Users

2.    **Software and Software Support Payment Schedule**

a)      Licensee shall pay a License Fee of One-Hundred Ninety Thousand Dollars ($171,000) for the initial Software License granted.

b)      Additionally, Licensee shall pay a Quarterly Software Support Fee of $8,550 for the initial Software License granted.

These amounts shall be payable as follows:

i.    Initial payment of $85,500 is due upon execution of this agreement.
ii.   The balance of $85,500 is due four months from the date on this License Agreement.
iii.  On the six-month anniversary of this License Agreement, and each quarter thereafter, Quarterly Software Maintenance equal to 5% of the then current License fee of the total accumulated software costs is due.

c)      If any amounts are not paid within 30 days after the date such amounts are due, Licensee agrees to pay late charges at a rate of eighteen (18%) per annum of the amount unpaid as a late penalty; provided, however, that in no event shall such charges exceed the maximum interest rate allowed by law.

d)      In the event Licensee shall fail to pay the fees and other charges due to Licensor hereunder when due, Licensor may, at its option, refuse to provide further services to Licensee under this agreement until such time as Licensee shall have paid any past due fees and other charges to Licensor.

3.    **Option to Purchase Additional Software**

a)      Licensee is granted the option to purchase additional Software Licenses at $1,700 per license seat.
b)      At such time as the number of Software Licenses equals (150), additional Software Licenses may be purchased for $1,500.

4.    **Software Support Advance Payments**

a)      Quarterly charges for Software Support are payable in advance. Software Support is provided free for the initial users during the first six months from the execution date of this agreement. Payment of the above Software Support fees will provide Licensee with Software Support until the Expiration Date, which is a period equal to three (3) months. In the event Licensee shall fail to pay the fees and other charges due to Licensor hereunder when due, Licensor may, at its option, refuse to provide further services to Licensee under this agreement until such time as Licensee shall have paid any past due fees and other charges to Licensor.

b)      Software Support for additional software purchases will be due and payable in advance and prorated quarterly.

c)      Software Support will be calculated at Licensor's then current rate. Licensor's current Software

Support fee rate is twenty (20) per cent per annum, which is collected quarterly ; however Licensor reserves the right to change the rate of Software Support with ninety (90) days written notice.

5.    **Web-Enabled Licenses**

    a)    Licensor utilizes a thin client application server to deploy the Program to remote users as well as to local users. The additional cost for this application is $160 per Licensed Concurrent User for the first year and an annual maintenance charge of $20 each year thereafter. Following installation of the software, Licensee will be invoiced $160 for each Licensed User identified in paragraph 1 a) above.

    b)    Should Licensee desire fewer web-enabled access licenses for local or remote users, written notification to Licensor must be provided in advance of installation of the software.  In lieu of this application server, Licensee may utilize Citrix or Terminal Services and no additional charges will be incurred.

6.    **Project Management, Training, and Implementation Services**

    a)    Licensee acknowledges that a successful implementation of Licensor's Program requires Licensee to make a minimum commitment in the use of Licensor's resources. More specifically, Licensee agrees to utilize Licensor's Project Management, Training, Implementation services which are outlined as follows:

        i)    **Project Management** – Licensee agrees to utilize a designated, qualified resource of Licensor who will act in its capacity as the Project Manager throughout Licensee's implementation. Licensor's designated Project Manager will co-manage the project on a time and materials basis (estimated to be 2-3 hours per week for 12 weeks) in conjunction with a designee of Licensee. Additionally, Licensee further agrees to utilize Licensor's web accessible project management software, Microsoft Project, as the primary tool for the specific purpose of tracking and monitoring all aspects of Licensee's implementation project. The cost for Project Management is billed at the rate specified in Schedule F.

        ii)    **Training** – Licensee agrees to utilize qualified resources of Licensor who collectively will act in its capacity as Trainers throughout Licensee's implementation. Licensors designated Trainers will be utilized for the specific purpose of providing the following trainings:

            a)    System Administration Training (SAT) – This required training provides Licensee's implementation team instruction in the definition, configuration, and use of the Program. This classroom style training consists of three (3) sessions ranging from three to five days each, with each one providing for a combination of instruction and "hands on" use. All sessions of SAT are required to be taken by the Licensee's implementation team members whose collective responsibilities are to assist in performing their respective assigned tasks during the implementation. Additionally, certain members of Licensee's implementation team will also be responsible for providing for the ongoing support and maintenance of the Program on Licensee's behalf, which will commence with the actual use of the Program in a production environment, a.k.a. "Go Live". The cost of System Administration Training is billed at the rate specified in Schedule F.

            b)    Custom Development Training (CDT) – This optional, minimum of eight to ten days, training provides Licensee's designated technical team members instruction in the definition, configuration, syntax, and the API for the tools used to customize the Program through the development of documents, formulas, utilities, interfaces, tasks, etc... This classroom style training consists of one session lasting four to five days, which provides for a combination of instruction and "hands on" use. Additionally, a minimum of one session lasting four to five days of real case

application co-development with a developer of Licensor is required within 30 days of CDT. Licensee agrees that its designated personnel participating in CDT must possess general programming skills. This training is conducted on your site and is billed at the rate specified in Schedule F. Additional or supplemental training classes are provided at Licensor's facility each month and are billed at the rate specified in Schedule F for up to two people.

iii) **Implementation** – Licensee agrees to utilize qualified resources of Licensor for a minimum of 10 business days during implementation. The cost of these services is billed at the rate specified in Schedule F. Licensor's implementation personnel will collectively assist in the ongoing configuration and definition of the Program throughout Licensee's implementation. Licensors designated implementation resources will be utilized for the specific purpose of providing the following:

a) Specific guidance as to the system's deployment, and how to best utilize/modify existing out-of-box functionality.

b) Specific guidance and insight as to what other clients of Licensor have done with the Program, both successfully and unsuccessfully.

c) Assistance in the definition/configuration of investor/product guidelines, workflow, distribution channels, pricing models, fees, security, document assignments, and contact management (i.e., rolodex/managed vendors).

d) Assistance in understanding the nuances of the credit reporting and AUS mechanisms as implemented by the Program.

e) Assistance in identifying and escalating issues that have the potential to delay the implementation.

f) "Hands on" guidance to newly trained administrators and team members.

g) Assistance in identifying required customizations of or appropriate workarounds for the Program.

h) Guidance to Licensee's Information Technology specialists as it relates to technology issues.

i) Assistance in communications between Licensee and Licensor.

b) Licensee agrees to pay Licensor for all project management, training, implementation expenses on a weekly basis based on the time and materials used as well as reimburse Licensor for the cost for reasonable travel expenses related to airfare, car rental and standard per diem for hotels and meals as provided in IRS Publication 1542 which is also available on the IRS web site at www.policyworks.gov/perdiem.

c) If requested by Licensee in writing, Licensor will provide additional training and implementation services at the rate specified in Schedule F. Forms and report creation will be billed at the rate specified in Schedule F.

d) Licensor reserves the right to change the billable rate on any of the services listed in Schedule F with notice.

7. **Customization**

a) If requested by Licensee in writing, Licensor will provide additional custom programming, custom document creation, custom interfaces and data mapping services at the billable rate specified in Schedule F.

b) Licensor will provide all existing interfaces, templates, screens and forms to Licensee, as is, at no additional cost to Licensee. If desired, Licensor will provide additional customization to any of the above based on the appropriate rate specified in Schedule F.

c) Licensor will furnish any custom programming requested by Licensee on a mutually convenient schedule based upon the availability of Licensor's personnel and current work schedule.

Rev. 1/4/07                     – 16 –

d)      Licensor may renegotiate the billable rates listed in Schedule F based upon the purchase of a block of hours of most of the listed services.

e)      Licensor reserves the right to change the billable rate on any of the services listed in Schedule F with notice.

## 8.    Miscellaneous

a)      Licensor will provide any documents currently in its library at no additional cost to Licensee. These documents consist of most but possibly not all of the standard documents for FNMA, FHLMC, VA and FHA and are kept in compliance by the forms supplier, which is either Wolters Kluwer Financial Services (formerly VMP) or Harland GreatDocs. The licensing and licensing expense of these documents shall be the responsibility of Licensee.

b)      This agreement will expire if not fully executed on or before April 30th 2007.

# Schedule - C

## California Financial Group/ Integra Hardware Configuration

Licensee recognizes that the hardware/software configuration below is considered by Licensor to be acceptable, whether or not recommended by Licensor, for operating the Program(s) provided in the Agreement. Licensor further makes no guarantees or warranties with respect to the configuration listed below. Licensee is solely responsible for the purchase, licensing, installation, configuration of all hardware and third party software.

➢ Database Server –
> Single Intel® Xeon™ processor at 3.0GHz/8MB Cache
> 6GB RAM
> Spilt Backplane with RAID 1 and RAID 5
> RAID for 1 OS   RAID 5 for DATA
> 74 GB + 15,000 RPM / SCSI hot pluggable HD
> 74 GB + 15,000 RPM / SCSI hot pluggable HD
> 146 GB + / 15,000 RPM / SCSI hot pluggable HD
> 146 GB + / 15,000 RPM / SCSI hot pluggable HD
> 146 GB + / 15,000 RPM / SCSI hot pluggable HD
> (Raid 5 or better)
> Dual Channel Array controller / 256 Cache
> Redundant power supply
> 100/1000 Network Adapter
> Windows 2003 server
> MS SQL 2005 Standard
> Veritas Net backup or similar

➢ Terminal Servers\ Web servers -
> Single Intel® Xeon™ processor at 3.16GHz/1MB
> 4 GB RAM
> 74GB / 15,000 RPM / SCSI hot pluggable HD
> 74 GB / 15,000 RPM / SCSI hot pluggable HD
> Raid 0 / Write Cache
> Dual Channel Array controller
> Redundant power supply
> 100/1000 Network Adapter
> Windows 2003 Server
> IIS

➢ Product Server – (Workstation Class)
> Pentium IV 2.4 GHz with 512K Cache
> 2 GB RAM
> 10 GB / 10,000 RPM
> Windows 2000

➢ Communication Servers- (Workstation Class)
> (DU, LP, Credit)
> Pentium IV 2.4 GHz with 512K Cache
> 1 GB RAM

10 GB / 10,000 RPM
Windows 2000

➢ Workstations-
Pentium III 500 MHz and above
512 MB of RAM
Windows 2000. NT. or XP

➢ Network
100/1000 Backbone
100 MB at each workstation

# Schedule –D

# Product Manager Setup & Maintenance

**Product Manager**
As an additional optional service, Licensor will setup and maintain the Destiny Product Manager with program guidelines for FNMA, FHLMC, VA, FHA and any investor, under the following terms:

**Setup** – Licensor will provide FNMA, FHLMC, VA, and FHA guidelines as well as any existing investor program guidelines at no cost. These programs and guideline sets have been previously disclosed in writing to Licensee. In addition, all currently available loan programs guidelines from the following investors will be added at an additional one-time, flat rate cost of $5,000. These investors are: Greenpoint, Impac, InterFirst, Flagstar and IndyMac. Thereafter, Licensor will provide any additional program guidelines to Licensee according the following schedule:

| | |
|---|---|
| Products 1 – 20 | $100 per product |
| Products 21 – 50 | $50 per product |
| Products 51 or more | $25 per product |

**Guideline Maintenance** - Licensee may request Licensor to maintain all investor product guidelines provided by Licensor for Licensee with any additions, deletions or changes to these guidelines on a regular basis. There is a minimum one year commitment for this service, which is billed monthly at the current rate of $1,000 per month plus fees per the following schedule based on number of products:

| | |
|---|---|
| Products 1 – 20 | $50 per product |
| Products 21 or more | $10 per product |

**Pricing Setup and Maintenance** - If desired, Licensor will setup an ongoing feed for Base Pricing Only for a one-time fee of $2,500. This setup assumes an electronic feed of regular base pricing provided in an excel (.csv) or XML mutually agreed upon formatted file. Pricing adjustment guidelines are available at our current rate of $200 per hour. These are provided by Licensee or an authorized third party on a case-by-case negotiated basis.

# <u>Schedule –E</u>

*<This page intentionally left blank>*

## Schedule –F

## Summary of Fees for Services

| One-time charges for implementation services | | Rate |
|---|---|---|
| Project Management | Oversee implementation from contract to go-live date | $175 / hr. |
| System Administrator Training | Three different sessions of 3 – 5 days each, on your site. | $200 / hr. |
| Implementation Services | Minimum 10 days of configuration and definition of the system | $200 / hr. |
| **Optional charges for miscellaneous services** | | **Rate** |
| Business Analyst Consulting | Review current business processes and provide suggestions for improvement | $200 / hr. |
| Train the trainers training | Four days or more (if necessary) of training the administrators of the system on how to train the staffs. | $175 / hr. |
| Customization Training A | Two sessions of 4 – 5 days of hands on instruction on customizing the application, documents and screens at your site. | $200 / hr. |
| Customization Training B | Group training at Integra site (conducted monthly) Limited to 2 people at this price. | $150 / hr. |
| End-User Training | Four days or more (if necessary) of training the users on the system. | $175 / hr. |
| User Acceptance Training | Use and testing of the system based upon your configurations and settings | $175 / hr. |
| Client System Testing | Rigorous analysis of your overall system | $200 / hr. |
| Crystal Report Training | Training in the design of custom Crystal Reports | TBD |
| Custom Screens | We will design custom screens for you per your specifications | $175 - $200 / hr. |
| Custom Forms | We will design custom forms for you per your specifications | $150 / hr. |
| Crystal Reports Development | We will design custom reports for you per your specifications | $150 / hr. |
| Custom Interfaces | We will design custom interfaces for you per your specifications | $175 / hr. |
| Custom Programming | We will develop any custom LOS application or utility for you | $175 - $200 / hr. |
| Custom Web Development | We will design, build or modify your website to meet your needs | $200 / hr. |
| IT Services | We will assist you with your database or hardware configuration needs | $200 / hr. |
| Network and hardware documentation | We will document your system configuration for daily maintenance, logging and disaster recovery purposes | $175 / hr. |

Rev. 1/4/07